**CARL STENGEL v. CHARLES H. CRANDON, et al., as County Commissioners of Dade County.**

23 So. (2nd) 835                                      June Term, 1945
November 27, 1945                                      Division B

*Hayzer & Padgett,* for appellant.

*Hudson & Cason* and *Rudolph Isom,* for appellees.

THOMAS, J.:

The appellant was alleged in his bill of complaint to be the owner of a tract of land in Dade County extending from Coral Way to Tamiami Trail, with a frontage on the former of one mile and on the latter of eight hundred feet. The east boundary is approximately two miles west of Red Road, the west boundary of Coral Gables, and the land is situated about nine miles from the post office in Miami.

Many years ago the appellees, or their predecessors, divided the county into zones where respective types of businesses may be conducted and buildings constructed. The appellant's property falls partly in districts designated GU, RU-2, RU-3, and BU-2. A narrow strip across the north part of it, bordering the Tamiami Trail, is in RU-3; a narrow strip along the east side is in RU-2; a small rectangular piece in the southeast corner is in BU-2; and the remainder, the bulk of it is in GU.

Before proceeding further we shall give in abbreviated form the regulations pertaining to the zones designated by these symbols. We must abridge them because these regulations, dealing not only with types of buildings but also with uses in each of the four areas, are quite elaborate.

The area designated as GU covers the entire unincorporated part of Dade County not included in other zones. The restrictions peculiar to this district deal, for instance, with conformation of building lines, for both residential and business structures, "setback" requirements, comparative sizes of one- and two-story buildings, the proportionate area of a given lot to be occupied by buildings, the type of accessory structures, the relative locations of industries and schools, and the like. Buildings in RU-2 may be used only for one- or two-family residences, depending upon the area of the particular lot. Here again are detailed specifications as to type, location, and relative position of structures. In RU-3 there may be built any edifice of a type permitted in RU-2 and also those to be employed as rooming houses, day nurseries, churches, colleges, and so forth. There may be erected in the area called BU-2, in addition to buildings of the kind permitted in the "RU-zones," business buildings of almost every conceivable kind, ninety-one of which are specially named. In the zone titled BU-3, otherwise designated as "Business Districts—Liberal," in which appellant wishes his property placed, the land may be used for any purpose in the preceding RU and BU zones and thirty-three others, including "Airports, Airplane Hangars or Airplane Repair Shops."

As is pointed out in the pleading, in none of the zones we have defined, save BU-3, may an airport and its accompanying hangars and shops be maintained.

The appellant applied to appellees' zoning director for revision of the regulations and restrictions so that his property, which we shall presently describe, would be incorporated in zone BU-3, thus enabling him to use it as an airport. As provided in the "Zoning Regulations," notice was given of a public hearing, and one was held, but no protests were offered, and all members of the commission in attendance approved his request. When, however, the recommendation of the com-

mission that his petition be granted reached the Board of County Commissioners, that body did not concur.

It is directly charged in the bill that the restrictions upon the use of the property are not in keeping with present or reasonably anticipated conditions of the land in question or the land surrounding it. On the north side of Coral Way, so it is averred, for a mile eastward from the southeast corner of appellant's tract there are two dwellings and one service station; on the south side of Coral Way, opposite appellant's property, which it will be recalled extends along that thoroughfare one mile, the section is unimproved; on the south side of Coral Way, east of this unimproved land, there lies a large tract also unimproved except for the tracks of the Florida East Coast and Seaboard Airline railways, a wood preserving plant, an incinerator, and five houses; on the north side of Coral Way in the section of land immediately west of appellant's there are but four houses and some small parcels used sporadically for farming and gardening.

The appellant insists that his property is particularly suitable for development as an airfield because of its size and for the reason, too, that for a considerable distance around it there has been slight improvement. He represents that the location has been approved for such purpose by the Civil Aeronautics Administration of the Department of Commerce of the United States, and that the War and Navy Departments have approved it as a site where the usual activities of an airfield will not interfere with army and navy operations in the county. There is a demand, so he claims, for such an airport in the vicinity.

It is charged that the action of the Board of County Commissioners amounts to confiscation, thus depriving him of a valuable property right without due process of law, and that the restrictions of the zoning law, which so severely curb his use of his land, are discriminatory and unreasonable.

A decree was sought to enjoin the imposition of any restrictions, except those applicable in zone BU-3, and to direct the Board of County Commissioners to allow appellant to utilize his land as an airport. The bill was dismissed on motion, and the appellant appealed.

At the outset of our discussion of the applicable law it should be expressly pointed out that appellant makes no attack on the constitutionality of the act authorizing the County of Dade to be zoned, but only upon the validity of the restrictions adopted pursuant to that law as they affect his parcel of land, remote as it is from the congested areas and surrounded as it is for a considerable distance by property on which there has been little improvement or construction.

Our observation will, therefore, be confined to a determination of the question whether interference with the use of this land amounts to a deprivation of property to such a degree that, as to it, enforcement of the regulations authorized to be adopted by the act constitutes a violation of guaranties vouchsafed to appellant by organic law. This method of approach to the problem seems to have been adopted by the Supreme Court of the United States, Euclid v. Amber Realty Company, 47 S. Ct. 114, 272 U.S. 365, 71 L. Ed. 303, 54 A.L.R. 1016, and by this court in City of Miami Beach v. Ocean and Inland Company, infra, where we said in hearing the merits of such a controversy "the facts peculiar to the particular case [would] govern."

This thought doubtless prompted Mr. Justice BROWN when he wrote the opinion for the court in Forde v. City of Miami Beach, 146 Fla. 676, 1 So. (2nd) 462, to say, after stating that there could no longer be any doubt of the power of a city acting under legislative authority to zone, that "a general attack [on the zoning ordinance] will ordinarily fail." The further expressions in this last case lead us from this principle of basing our decisions relative to zoning on the facts and circumstances of the immediate controversy to the pivotal points in this, as in other similar cases—namely, the extent to which appellant suffers in relation to the benefits redounding to the community. In the Forde case the then chief justice remarked that free use of their property by urban owners might be interrupted by legitimate exercise of police power in the interest of "public health, safety, morals, or general welfare." In one case, City of Miami Beach v. Ocean and Inland Company, 147 Fla. 480, 3 So. (2nd) 364, upholding a zoning ordinance we took into consideration

aesthetics in connection with general welfare of a community having the characteristics and the appeal of Miami Beach.

Here, bearing in mind the protection which appellant enjoys under the constitution, we are confronted with the question whether an owner of suburban, not urban, property comparatively isolated, as has been seen from the allegations of the improvements thereabouts and the remoteness from the congested eastern part of the county, may be prevented from using it as an airport by interposition of police power on the ground that so to use it would impair the health, safety, morals, or general welfare of the community. The extent to which the constitutional protection of the property owner must give way depends entirely upon the demands of the health, safety, morals, and welfare of the municipality. This situation is what makes so difficult a decision in individual cases and so impractical the determination of one case which will govern all.

It is always with reluctance that the courts allow interference with legitimate use of property by the owner, and yet it is ever to be borne in mind that its use must depend in a certain degree upon the effect on the happiness, prosperity, health, and safety of the whole community, or, if we cling to the familiar phraseology, "the health, safety, morals, and welfare of the general public." Innumerable proper and legitimate uses of property may, if they be exercised in a given locality of the community, become a detriment to one of these well recognized considerations. While discussing the same matter in City of Miami Beach v. Ocean and Inland Company, supra, we said: "It is fundamental that one may not be deprived of his property without due process of law, but it is also well established that he may be restricted in the use of it when that is necessary to the common good," language which was later quoted with approval in a decision by Mr. Justice WHITFIELD in City of Miami v. Rosen, 151 Fla. 677, 10 So. (2nd) 307.

As we have remarked, it is not our privilege or our purpose to substitute our judgment for that of the legislative body; however, if the "restrictions are so unnecessary to the general welfare of the inhabitants that the curtailment of the

rights of the [owner] are unreasonable and arbitrary" the situation is subject to judicial inquiry, for "such restrictions must have their basis in the safety, health, morals or general welfare of the community." City of Miami v. Ocean and Inland Company, supra.

The distance of appellant's property from the heavily populated territory, from the metropolitan districts, has been noted, and this characteristic, of course, has great weight in his favor. The appellees counter with the statement that the west and north boundaries are contiguous to arterial highways, Coral Way and Tamiami Trail, so that many planes, if not most of them, in landing and taking off would pass over these thoroughfares. They remind us that Red Road is but a mile distant, and presumably this highway too would be jeopardized by flights to and from the property. According to the map made an exhibit to the bill, it is two miles away. They emphasize the fact that Coral Gables is only two miles distant. Appellees are apprehensive, it is said in their brief, not only about potential damage, but also about the commotion which would be caused by motors of the planes.

It does not appear to us that public health or morals could in any wise be endangered by the use of the property as an airport; so by the process of elimination we may confine our study to the possible effect on safety and general welfare. From their brief it appears that the appellees justify the restrictions because of the first of these. It is difficult for us to adopt the view that this position is reasonable, even though Tamiami Trail and Coral Way are hard by, Red Road, the west boundary of Coral Gables, two miles away. In any metropolitan center of America the droning of airplane motors is almost constant, and obviously aircraft bearing passengers, mail, and freight in and out of cities could not operate were their approaches and departures confined to territory uninhabited and untraversed by roads and highways. In almost every town of any consequence in Florida for more than three years the sound of airplanes has been almost incessant as men trained in them for the very purpose of safeguarding the constitutional guaranties, including the one that a person may not be deprived of property without due process

of law, by warding off the attacks of enemies advocating the ideologies which were the very antitheses of the American system of government. These airplanes are not mere noisy nuisances, nor are they vehicles still in the experimental stage, but they represent the latest means of transportation, and certainly if we are to progress, the establishment of airports to accommodate them should be encouraged.

A careful study of the bill of complaint has led us to the conclusion that it does contain equity. We apprehend that in proving its allegations the appellant may well be able to demonstrate to the satisfaction of the chancellor that the use of his property as an airport will not so affect the safety and general welfare of the people of Dade County as to justify the infringement of his right to utilize it for that purpose.

The order dismissing the bill of complaint is—

Reversed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur.