**HERBERT A. FRINK, RALPH C. POLE et al. as City Councilmen of the City of Miami Beach, a municipal corporation of Florida; HERBERT A. FRINK, as Mayor and C. W. TOMLINSON as City Clerk of the City of Miami Beach, Florida; and CITY OF MIAMI BEACH, FLORIDA, a municipal corporation of the State of Florida, v. ORLEANS CORPORATION, a Florida Corporation, and FOUR WINDS AIR ASSOCIATION, INC., a Florida Corporation.**

32 So. (2nd) 425    June Term, 1947
Opinion filed November 7, 1947    Division B

Ben Shepard, Meyer, Weiss & Rosen and Vivion B. Ruther-ford, for appellants.

Hunt & Salley, for appellees.

BUFORD, J.:

Prior. to 1930 some small islands were created in Biscayne Bay by the depositing of spoils from the dredging of a channel. One of these islands was called Lummus Island and it was located in, and near the southwest corner of, the City of Miami Beach. In the year 1930 Miami Beach adopted Ordinance No. 289 which was a comprehensive zoning ordinance. That ordinance was, from time to time, amended until August 1, 1945, when, with maps attached and made a part thereof, it was printed and published as "Zoning Ordinance of the City of Miami Beach, Florida amended as of August 1, 1945." No-where in the ordinance, or in the maps and plats attached thereto and made a part thereof, is any reference made to this island.

The record shows clearly that there was no intention on the part of the City to designate any zoning classification of this island. There is, however, in the ordinance the following provision:

"Any land or premises not shown within the boundaries of any use, height or density districts within the City of Miami Beach, or which may hereafter be annexed to the City of Miami Beach, shall be considered to be the 'RD' Single-Family District, and Area District No. 13. (606)"

Section 5 of the Charter Act, being Chapter 9837 Acts of 1923, is as follows:

"Sec. 5. Such regulations, restrictions and boundaries, may, from time to time, be amended, supplemented, changed, modified, or repealed. In case, however, of a protest against such change, signed by the owners of twenty per cent or more, either of an area of the lots included in such proposed change or those immediately adjacent in the rear thereof, extending Three Hundred Seventy-five feet therefrom, or of those directly opposite thereto, extending Three Hundred seventy-five feet from the street frontage of such opposite lots, such amendment shall not become effective, except by the favorable vote of five-sevenths of all of the members of the City Council of said municipality. The provisions of the previous section, relative to a public hearing and official notice shall apply equally to all changes or amendments." Section 21 of the involved ordinance provides as follows:

"Upon its own initiative or upon the petition of the owners of a majority of frontage in any area, the City Council may, after having held a public hearing following at least fifteen (15) days notice of a time, place and object of such hearing published in an official paper, or a paper of general circulation in said City of Miami Beach, amend, supplement, change, modify, or repeal the regulations and boundaries herein established, provided, however, that no amendment shall become effective except by the favorable vote of five-sevenths (5/7) of all of the members of the City Council."

"The provisions relative to public hearings and official notices shall apply equally to all changes or amendments."

It may be noted here that the provision requiring 5/7 vote of the City Council only applies in cases of protest against the change made by the owners of 20% or more either of an area of the lots included in such proposed change or those immediately adjacent in the rear thereof extending 375 feet

therefrom or of those directly opposite thereto extending 375 feet from the street frontage of such opposite lots. Therefore, that provision has no application to Lummus Island, because there were no protesting lot owners falling within the limitation.

For more than twenty years this island has remained unused and unoccupied for any purpose whatever.

In 1945 Four Winds Air Association, Inc., acting through its President, M. B. Carstairs, consummated a lease agreement with the owner of Lummus Island, Orleans Corporation, for the purpose of erecting and operating thereon a sea-plane base and a service center for land and sea-planes and thereupon on September 5, 1945, made application to the City Council of Miami Beach for a permit to erect and operate such facilities on Lummus Island under a plan and conditions fully set forth in such letter of application for permit. This application was presented to the Mayor and City Councilmen at a regular meeting of the City Council on said date. The applicant appeared again before the City Council at a regular meeting on September 14, 1945 and was advised that the Council had the matter under consideration and that applicant would be promptly advised of its decision in this regard.

On September 21, 1945, at a recess session of the City Council, the following proceedings were had:

"Mr. Parrish then advised that the committee had also made a careful study of the M. B. Carstairs request for a permit for a sea-plane base and land and sea-plane service center on Lummus Island. He said that aside from the question of whether this development would interfere with a turning basin in the channel, the Committee was favorably disposed toward the project. He said that Col. George E. Brown had advised the Committee that the project would not interfere with traffic in the channel and he said that he did not see why it would not be proper for the Council to approve the project and let the War Department and the Civil Aeronautics Board decide as to the question of traffic in the channel. He said he thought it a good project and one the City will need in the future. He pointed out that Miami Beach would possibly become one of the first cities in the United States to have such a base.

"Councilman Levi said that property owners might raise objections because of the noise attendant upon the operation of the base, pointing out that the numerous planes will be landing and taking off from the base.

"Councilman Liberman agreed with Councilman Levi as to the possible nuisance from noise, but he said he felt that in principle such a base would be an asset to the City. He said that he thought Miss Carstairs should be given an answer one way or the other.

"Councilman Powell said that he was favorably disposed toward the project and he concurred in Councilman Liberman's opinion that an answer should be given Miss Carstairs without delay.

"Councilman Snedigar said that since the questionable factor seemed to be the possibility of the base becoming a nuisance because of the noise involved, he suggested that the applicants be requested to post a bond or enter into an agreement with the City to the effect that if, in the opinion of the Council, the base becomes a nuisance it will be abandoned.

"Councilman Powell asked the City Attorney what legal action could be taken if the operation of the base becomes a nuisance.

"Mr. Shepard said that when any property becomes a public nuisance the Council can ask that the nuisance be abated. He said that he did not know whether an agreement such as Councilman Snedigar suggested would be enforceable or not.

"Councilman Powell then moved that the Council favorably pass on the project of building a sea-plane base and land and sea-plane service center on Lummus Island, with the understanding that before any permit is issued for the construction, a letter be secured from the Carstairs Corporation to the effect that if at a later date the operation of the business becomes a nuisance, they abandon same.

"The motion was seconded by Councilman Pole and carried unanimously."

The applicant being advised of this action furnished the letter suggested by the City Council and proceeded to pay substantial sums of money to its lessor and to expend large sums of money for the services of architects, publics relations

counsel, attorneys, airport engineers of National repute, and divers employees of technical training and skill to assist in the essential details incident to the formation of a proper organization the blue-printing of plans, the collection of technical data and information, the contracting of labor and material sources, and the development of manifold drawings, airport regulations, fueling facilities and other things reasonably necessary for the proper and complete initiation and completion of such project, procured the approval of its application to construct the facility by the Regional Inter-Departmental Air Traffic Control Board and later by the Senior Aeronautical Inspector who issued official permit or license for the operation of said facility on November 23, 1945.

On November 25, 1945, applicant received from the City Clerk advice that because of the provisions of Sec. 37 of the Ordinance, supra, the City Council had decided to interpret the Classification of Lummus Island to be within the City's Zone RD. In this letter of advice it was suggested that the petitioner request a rezoning of Lummus Island so as to permit the construction of the facilities contemplated. On November 27, 1945, the petitioner made the request suggested. Thereafter notice was given by the City Council that it proposed so to amend the ordinance. In pursuance of this notice of a public hearing, the Council met on January 2, 1946, and heard statements for and against the proposition. Thereafter on January 16, 1946, the matter was further heard by the City Council. On January 22, 1946, six members of the Council being present, four members voted for the approval of amendment to the ordinance and two voted against the amendment.

On February 6, 1946, six members of the Council being again in session, the matter of adopting the ordinance was again brought up and three members of the Council voted in favor of amending the ordinance and three voted against it.

On March 16, 1946, plaintiffs, appellees here, filed their bill of complaint in the Circuit Court for Dade County, Florida, in which they alleged, in addition to the matters above set forth: "that all lands adjacent to Lummus island are placed in unrestricted business zones and areas by the Zoning Ordinance

of the City of Miami Beach; that to the southeast a distance of 1000 feet lies Fisher's Island, designated 'BF' and 'BG' (unrestricted business); that northeastward from Lummus Island 1100 feet is situate a peninsular extending from the elbow turn of the MacArthur (County) Causeway which likewise has a 'BF' classification and on which are situated an electric power plant, surface oil tanks, and a large commercial ship dock and warehouse for storage purposes. Within 200 feet northeast of this tank farm-ship dock facility is a large island connected to the MacArthur (County) Causeway by bridge which is owned by the United States Coast Guard and used for ship docking, storage, personnel barracks, dining hall, etc.

"Immediately north of Lummus Island is the main ship channel and then the heavily traveled MacArthur (County) Causeway.

"South of Lummus Island is a broad open expanse of shoal bay water; Virginia Key lies to the southeast approximately two-thirds of a mile and is likewise classified within the 'BG' zone by defendant City.

"On the west in tandem and parallel to the Ship Channel lie five spoil islands of various sizes which lie within and are owned by the City of Miami. Although never zoned by the City of Miami, said City considers said islands wholly unsuitable for residential purposes and has never contemplated or planned other than a possible commercial use of same for providing additional docks, etc. The City of Miami has no plans for use of its spoil islands at this time, commercial, business or otherwise.

"So it is that of the chain of eight spoil islands, starting with Fisher's Island on the east and extending almost to the ship docks in Miami proper, Lummus Island is the only one of such islands which is not zoned and regarded as suitable only for unrestricted business structures and operations. Its proximity to the constantly used Ship Channel, the heavily traveled County Causeway, the electric power tank, oil tanks, ship docks and warehouses; its shoal water-mud bottom surroundings; its total lack of bridge or causeway connection with the mainland; its relatively small size; all unite to bear

tests to the absurd and unreasonable situation in which the owner and lessee of Lummus Island, plaintiffs herein, have been unconscionably and inequitably placed as a result of the arbitrary and confiscatory 'RD' residence use regulation so illogically imposed upon them in the manner aforesaid."—and prayed:

"(a)  The court will assume jurisdiction of parties and subject matter;

"(b)  determine the equalities to be with and in favor of plaintiffs, according to their respective interests;

"(c)  that the defendant City Council and City of Miami Beach will be enjoined by this court from enforcing or attempting to enforce the aforedescribed 'RD' residence use zoning classification and restriction upon Lummus Island;

"(d)  that defendant Council and City of Miami Beach will be mandatorily directed and required to zone and accord a use classification to Lummus Island in keeping with regulations covering all surrounding and adjacent unrestricted business areas, and to permit and license the use by plaintiffs of said island for air base operation in daylight hours, in accordance with the application previously submitted; and

"(e)  for other equitable relief."

The defendant City filed motion to dismiss the bill and motions to strike certain parts of the bill.

The motion to dismiss was denied and certain parts of the Bill of Complaint, not necessary to be considered here, were stricken.

Thereupon answer was filed.

The cause being at issue was referred to a Master to take testimony and report the same with his findings of law and fact based thereon.

After considering the cause and hearing the testimony adduced the Special master made his report to the court and submitted his findings and thereupon recommended to the court as follows:

"Said Court should enter a final decree:—That all provisions of Zoning Ordinance No. 289 of the City of Miami Beach, which ordinance was adopted on December 3, 1930, as amended, which restrict or limit the use of that land situate

in Miami Beach, Dade County, Florida, shown on Plaintiff's Exhibit 19 as 'Lummus Island' to 'RD' single family district use within the meaning of said ordinance, as amended, are unreasonable, arbitrary, discriminatory and without substantial relation to the public health, safety, morals, comfort and general welfare and deprive Plaintiffs of the beneficial use and enjoyment of said land, and operate to take and confiscate said land without just compensation to plaintiffs and consequently said portions of said ordinance, as amended, which limit or restrict said land to 'RD' or single family use, as said use is now defined by said Ordinance as now amended, are hereby decreed to be null and void, and of no force and effect, and the defendant City of Miami Beach, a municipal corporation, and its officers and employees, are hereby permanently enjoined and restrained from enforcing as against said land or any part thereof sad portions of said ordinance, as amended.

## IV

"Said Court should enter a final decree:—That any zoning by defendant City of Miami Beach, a municipal corporation, of said Lummus Island that will place said land or any part thereof in 'RAA', 'RA', 'RB' and 'RC', estate districts, or any of them, or in an 'RDD' modified single family district, or 'RDE'', restricted multiple family district, or an 'RE' multiple family district, or in any of the following business districts: 'BAAA', 'BAA', 'BA', 'BB', 'BC' as said districts and the uses to which land situate therein may be put are now defined by said Zoning Ordinance No. 289, as amended, will be unreasonable, arbitrary, discriminatory and without substantial relation to the public health, safety, morals, comfort and general welfare, and will deprive plaintiffs of the beneficial use and enjoyment of said land, and operate to take and confiscate said land without just compensation to plaintiffs; and, consequently, defendant City of Miami Beach, a municipal corporation, and its officers and employees are hereby permanently enjoined and restrained from zoning said land so as to place it in an "RAA', 'RA', 'RB', and 'RC' estate district, or in any of them, or in an 'RDD' modified single family district, or 'RDE' restricted multiple family district, or an 'RE' multiple

family district, or in any of the following business-districts; 'BAAA', 'BAA', 'BA', 'BB' and 'BC', or in any of them as said districts and the uses to which the land therein may be put are now defined by said ordinance, as now amended.

## V

"Said Court should enter a final decree:—That the City Council of Miami Beach be mandatorily directed and required to zone and accord a use classification to Lummus Island in keeping with regulations covering all surrounding and adjacent unrestricted business areas, and to permit and license the use by plaintiffs of said island for airbase operations in daylight hours."

The final decree adjudged that the court had jurisdiction of the subject matter and of the parties and, inter alia, decreed:

"5. The master's conclusion of Law, number V, to the effect that a decree should be entered 'to permit and license the use by Plaintiffs of said island for air base operation in daylight hours' is found to be too broad, and to go beyond the case declared upon and made out by plaintiffs, in that it fails to take into account the limitations on operation of the air base (in addition to the limitation to daylight hours) that the plaintiffs' 'proposed plan' sets forth.

"6. As shown in the bill, the nature, purpose, scope and limitations of the air base or airport operation proposed for the location in question, were set out in a letter to the city officials, as follows:"

Then the decree quoted the letter referred to and, after quoting same, said:

"The writer of that letter by her own testimony shown at pages 79 et seq. is revealed as to the president of the plaintiff corporation, Four Winds Air Association, Inc., and her testimony shows that the foregoing letter was adopted by the corporation, which has committed itself to respect the terms, conditions and limitations of operation as there set out. Plaintiffs' Exhibit No. 21 is a plan and Survey Report prepared by an engineering Concern, presumably on the basis of the plan of operation or limited operation as provided for in

the above letter, and so recognized in the testimony of said witness.

"7. Counsel for defendants stressed before me the point that plaintiffs' case was brought and tried on the basis of theory of this proposed (limited) operation, and that rulings on matters of evidence throughout the trial were predicated thereon; and such appears to be supported by the record.

"8. There is an element of equitable estoppel involved in this case, and although it was not expressly so found by the Master, its effect is consistent with the conclusions reached by the Master. It results from the approval by the City of the request made by the above letter for permit to so operate, which approval was given by the City Council and later withdrawn (upon discovery of zoning questions involved) after some substantial expenditures had been made by this plaintiff lessee of the land.

"9. The question of whether such equitable estoppel would operate, where the use sought would contravene public safety and welfare, is not involved here because (1) an airport operation is not a nuisance per se, and (2) the findings here were to the effect that public safety and general welfare would not be adversely affected.

"10. On the circumstances shown to exist reflecting the liberal use zoning recognized as appropriate and giving to the part of the City lying along and to the south of the MacArthur (County) Causeway, it would be discriminatory to grant, for the property involved, a classification so restricted as not to permit business uses of a class or character including the one sought. For that reason, it does not follow (as contended for by the City) that such a liberal zoning cannot be required to be fixed unless it can be shown that no use other than an airport or air base is economically possible for this property. This is not so much a case for changing or liberalizing a planned zoning, as it is one for initially fixing a proper zoning classification for this hitherto unused and unzoned area. It is apparent that the arbitrary zoning of the property for residential use was a stop-gap, to hold it for future consideration and fixing of proper zoning classification at a later date.

"11. If, then the property and area warrants a business zoning classification of sufficient liberality to include an air base such as that which is proposed, the City's objections are (1) adverse effect on residential property on the island to the northward, (2) danger apprehended, and (3) general inappropriateness of any air base or air plane project in that City. The Master found against detrimental effect on the residential property (the nearest of which, I believe the record shows, is one-half mile distant), and the master found against the contention of apprehended danger. The evidence sustains those findings.

"12. The City's objection to any airport in general is its claim that the 'overall picture of Miami Beach' presents no room for an airplane project or airport. In Stengle v. Grandon, 23 So. 2nd 835, the Supreme Court said:

" 'In almost every town of any consequence in Florida for more than three years the sound of airplanes has been almost incessant as men trained in them for the very purpose of safe-guarding the constitutional guaranties, including the one that a person may not be deprived of property without due process of law, by warding off the attacks of enemies advocating the ideologies which were the very antitheses of the American system of government. These airplanes are not mere noisy nuisance, nor are they vehicles still in the experimental stage, but they represent the latest means of transportation, and certainly if we are to progress, the establishment of airports to accommodate them should be encouraged.'

"The City's objection to having any airport activity within its boundaries, is contrary to transportation progress as indicated in the above quoted language of the Supreme Court. This Court takes judicial notice of the nature and extent of the City in question, and it is not considered necessary to detail its characteristics. That question as raised by the City need not be decided with reference to an airport for unrestricted commerce or operation, as this case deals with a proposed airport operation under restrictions.

"13. In view of the foregoing, it cannot be found or held that the 'proposed' air base operation on Lummus Island

would be against the public morals, health, safety or general welfare.

"14. IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED, that the defendant members of the City Council of the City of Miami Beach, shall convene without undue delay, and amend the city's general zoning ordinance, number 289, so as to allocate to Lummus Island, the property involved in this suit, a business zoning classification which will include among its defined or permitted uses, the maintenance and operation of an airbase as proposed and outlined in the above quoted letter to the City Council dated September 5, 1945.

"15. The relief granted herein to the plaintiffs is for operation of air craft and an airplane and seaplane base on Lummus Island, as proposed and within the limits set out in the said letter to the City Council quoted above in paragraph 6 of this decree and as detailed in plaintiffs' exhibit 21. Plaintiffs and their successors and assigns are hereby placed upon notice that this decree is so conditioned and that regardless of later investments and expenditures by them or either of them on said property for said uses or purposes, the operation will be required to be conducted within the limits and within the manner represented as aforesaid by plaintiffs, and not in a manner which shall be or become a nuisance in fact or otherwise against the public welfare.

"16. In order to prevent the possibility that this decree may operate injuriously in the future, the defendants hereafter may apply to this court, by separate bill, or by petition or motion in this cause, to limit, restrain or abate any such use or operation on said premises (1) which shall constitute a nuisance in fact, or (2) which shall exceed the nature of the project as so proposed represented and limited by plaintiffs in a substantial respect which shall cause the same to be against the public welfare of and in said city. As precedent and authority for so retaining jurisdiction, compare Glenn v. Field Packing Co., 290 U.S. 177, 179, 78 L. ed. 252, 254, and see Fletcher, Equity Pleading and Practice, Sec. 703; and this Court does hereby retain jurisdiction of this cause for the purposes stated."

It appears to us, after having set forth the material factual conditions, the pertinent part of the report of the Master and the pertinent part of the final decree of the Chancellor, nothing of value may be added by us in support of the affirmance of the final decree and as no reversible error has been made to appear and the decree is amply supported by the evidence, the same should be affirmed.

It is so ordered.

THOMAS, C. J., ADAMS and BARNS, JJ., concur.