329 So.2d 10 (1976)
The HOLLYWOOD BEACH HOTEL COMPANY, an Ohio Corporation, et al., Petitioners,
v.
The CITY OF HOLLYWOOD, a Municipal Corporation, Organized and Existing under the Laws of the State of Florida, Respondent.
No. 44642.
Supreme Court of Florida.
January 21, 1976.
Rehearing Denied April 13, 1976.
*11 Judson A. Samuels and Hugh S. Glickstein of the Law Offices of Judson A. Samuels and Hugh S. Glickstein, Hollywood, and Howard M. Neu, North Miami, for petitioners.
J. Bart Budetti, City Atty., and Myron H Burnstein, Special Asst. City Atty., for respondent.
PER CURIAM.
This cause is before us on a petition for writ of certiorari to review the decision of the Fourth District Court of Appeal.[1] We have jurisdiction pursuant to Article V, § 3(b)(3), Fla. Const.
As a general rule, an outline of the sequence of events in chronological order is not of vital importance. However, the instant case represents a significant exception to this rule.
*12 Petitioners-plaintiffs owned a 105 acre plot of real property in the City of Hollywood which was zoned RA-5 (golf course use) except for a 400 x 400-foot portion in the southwestern corner of same which was zoned RC-12 (multiple family). In late 1968, the petitioners decided to develop the property into a 6,000 unit complete community and petitioned the Hollywood Planning and Zoning Board to zone the entire plot as RC-12 (multiple family). This change was recommended to the Hollywood City Commission by the Planning and Zoning Board, whereupon the City Commission adopted Ordinance 0-69-46, hereinafter referred to, with the preamble reading in part, as follows:
WHEREAS, the City Commission, after several public hearings and only after an independent investigation and study, recognizes that the character of the neighborhood has gone through a series of changes so as to require the granting of the change of zone as hereinafter provided in order to properly preserve and protect the public interest, and
WHEREAS, the City Commission, after careful study of all aspects of the petitioner's application, including traffic patterns, population density, aesthetic considerations, effect upon single family residences in the area, as well as the effect upon the business establishments in the downtown area, considers that the public interest not only justifies but requires that the change of zone be granted so as to permit construction of the complex in accordance with the circumstances recited herein and as the same appears on the site development plan, attached hereto and made a part hereof as though fully recited herein." (Emphasis supplied.)
On April 2, 1969, after numerous public hearings and conferences between the City and the petitioners, a comprehensive site plan was approved and the City Commission by a 4 to 1 vote adopted Ordinance 0-69-46 which rezoned said property to RC-12 uses. In early December of 1969 in a City election, two commissioners who voted for the ordinance were defeated by candidates publicly opposed to same. On December 17, 1969, at the second meeting following their election, the two newly elected commissioners joined with the commissioner who had originally voted against the ordinance and passed a motion to petition the Zoning Board to reevaluate the rezoning affected by the foregoing ordinance. This petition did not contain and was not grounded upon any allegations necessitating rezoning.
On December 30, 1969, petitioners obtained a building permit from the State for the construction of the first five million dollar building. The Zoning Board met on January 12, 1970, and considered the Commission's petition to reevaluate the zoning affected by the above ordinance. At this meeting, the Board stressed the need for zoning stability and stated that the Commission had never "come back" with a request for a change in a duly enacted zoning ordinance. The motion was tabled and the Board at its February 9th meeting requested clarification from the Commission.
In the meantime, on January 23, 1970, the City issued a building permit for same. At this point, it must be noted the uncontroverted testimony established that it had taken some nine or ten months (April 1969-Jan. 1970) for the petitioners to complete the necessary preparations to begin construction. During this period and subsequently, petitioners expended some $191,269.66.
On February 18, 1970, the Commission in response to the request for clarification by the Zoning Board passed a motion to petition the Zoning Board to rezone the western one-third of the tract to multiple family and the eastern two-thirds to single family golf course use. On February 19 the City filed this petition with the Zoning Board.
*13 On February 21, the petitioners brought an action for a permanent injunction with an accompanying request for a temporary injunction against the City. At the hearing on the temporary injunction and the City's motion to dismiss on March 4, the following pertinent testimony was given: The architect for the project testified that the entire site plan would be destroyed by rezoning part of the property; a member of the Zoning Board testified that the City's petition for rezoning did not contain any allegations that a change in the area where the property was situate necessitated rezoning; and the petitioner, Ben Tobin, testified as to the amount of money expended and that all activities had been brought to a halt because of the City's petition to rezone.
The trial court denied the temporary injunction on the grounds that the application was premature on March 5th. On March 13th, the City's Motion to Dismiss was denied. The City then voted to file an interlocutory appeal on March 16th and such appeal was filed on March 19th.
On March 23rd, the Zoning Board denied the petition to rezone.
The Commission next voted on March 25, 1970, to appeal this denial to the Zoning Board of Appeals, the members of which were comprised solely of the City Commissioners. Such appeal was filed but no definitive action was taken by the Board of Appeals until Feb. 17, 1971. However, at its April 5, 1970, meeting, the Board of Appeals voted to table the appeal for thirty to sixty days. On June 17th, the Board of Appeals discussed the tabled appeal and voted that it be tabled no longer than the first meeting in August.
On July 15th, the City Commission, in response to a request for an extension of the building permit, voted to extend the building permit indefinitely until the litigation was completed.
At the August 8th meeting of the Board of Appeals, the appeal was left tabled due to the possibility that the City might purchase the property in dispute.
Then, on August 21st, the District Court affirmed the trial court's denial of the City's motion to dismiss.
At its September 2nd meeting, the City Commission voted to petition the District Court for rehearing and if unsuccessful, to petition the Supreme Court for certiorari. Prior to the taking of this vote, one of the Commissioners who voted in the majority, stated that these actions should be taken since "the City could operate with more leverage as to the purchase of the property if the case remains in Court." The District Court denied rehearing on September 29, 1970; this Court denied certiorari on January 7, 1971; and the City filed its answer to petitioner's complaint on February 17, 1971.
On the same day the Board of Appeals (City Commissioners) without prior notice to the petitioners, affirmed the Zoning Board's denial of petition to rezone; and then the (same people sitting as) City Commissioners rescinded its motion of July 15, 1970 which had extended the permit until the end of the litigation between the parties and mandated that the petitioners exercise their rights under the building permit within ninety days.
Prior to the vote on the petition for rezoning and the ninety-day motion, one of the Commissioners who voted for the petition by the City to rezone, stated that he would "now vote" to affirm the Zoning Board's denial since he did not think the project would ever be built without deviations which would have to come before the Commission for approval. On March 17th, the petitioners requested the return of the permit fee until building conditions improved. This was denied.
In regard to the City's repeal of the building permit allowing an extension to the end of the litigation, it is important to note that during the ninety-day period referred to above, the injunction suit was *14 actively prosecuted by both parties, to-wit: on March 12, 1971, petitioners moved to strike parts of City's Answer; on March 29, 1971, the petitioners moved to amend Complaint; on April 12, City moved for judgment on the pleadings; and on April 20, City's motion for judgment on pleadings was denied and the petitioners' motion for leave to amend was granted.
From June 23, 1971 to January 5, 1972, the City negotiated with the petitioner for the purchase of the property. In the December 1971 City elections, the remaining two Commissioners who had voted for Ord. 0-69-46 were defeated by candidates publicly opposed to it. At its January 5, 1972 meeting, the Commission voted not to buy the property even though a verbal understanding had been reached as to both price and method of financing. The Commission again then passed unanimously a motion requesting the Zoning Board to reconsider the zoning implemented by Ord. 0-69-46, and, in addition thereto, to recommend suitable rezoning (a matter which was not raised in its first request for reevaluation). The Commission also then took the first vote on a new density ordinance which would have the effect of rendering the petitioners' site plan useless. Petitioners sought a "temporary injunction" (incorporating all prior pleadings before the court) on February 12. On February 14, the Zoning Board approved a rezoning plan and recommended same to the City Commission.
It is significant to note that at the Zoning Board meeting there was no allegation of a change in the neighborhood as basis for the rezoning.
At the hearing on the temporary injunction, the petitioners submitted testimony: that during the almost one year that the Commission had considered action on the petition to rezone, this delay coupled with newspaper coverage of same made it impossible to obtain financing and discouraged investors; that no prior notice had been given of the City's decision on January 5, 1972, not to purchase the property; and that due to these prolonged negotiations, the development had been kept in limbo; that the proposed new density ordinance destroyed the site plan and rendered the building permit useless.
The temporary injunction filed on February 12, 1972, was denied on February 18, 1972. The density ordinance received final passage on March 1, 1972, and on March 15, the Commission voted unanimously to petition the Zoning Board to rezone the property in question. The Zoning Board approved same on April 17 and on June 28, the Commission enacted the rezoning ordinance.
On April 27, the trial court held a hearing at which the petitioners submitted the following testimony: $191,269.66 had been expended in reliance on the rezoning and the permit; that the density ordinance and proposed rezoning completely destroy the site plan; and that if the injunction was granted, the petitioners intended to build if financing and the market were suitable. The City Planner testified that the disputed ordinances did not destroy the site plan; however, at the continuation of the hearing on May 11, the City Planner then admitted that said ordinances did destroy the petitioners' site plan.
On July 19, the trial court issued a permanent injunction enjoining the City from enforcing both the density and subsequent rezoning ordinances against the petitioners and ordered that the City return the building permit fee.
The District Court of Appeal, Fourth District, reversed and remanded with instructions and this Court granted certiorari.
Three issues require our attention: First, whether the Fourth District Court of Appeal reevaluated the evidence and substituted its judgment for that of the chancellor; Second, whether the principle of equitable estoppel precluded the City of Hollywood from enacting the disputed ordinances; and Third, whether the chancellor *15 erred in finding as a matter of law that the City's retention of the petitioners' permit fee constituted a forfeiture? All three queries must be answered in the affirmative. Accordingly, the decision of the Fourth District Court of Appeal is quashed as to the first and second issues and affirmed as to the third.
It is the prevailing rule in this jurisdiction that an appellate court cannot reevaluate the evidence and substitute its judgment for that of the trial court. Westerman v. Shell's City, Inc.;[2]Greenwood v. Oates.[3] After comparing the chancellor's findings with the recital of facts by the Fourth District, it is only too clear that the District Court violated this rule. The chancellor found that because of the delays caused by the City the developer was unable to build within the required ninety days due to the economic conditions which precluded same. Whereas, the District Court in its reevaluation stated that the developer "elected not" to proceed and "surrendered" his building permit.[4]
"To elect" is defined as to choose by preference a course of action.[5] In turn, "choice" is defined as the "voluntary and purposive or deliberate action of picking, singling out, or selecting from two or more that which is favored or superior."[6] Petitioners "chose" not to build within the ninety-day period; correspondingly, it is undisputable that the trial court found this "choice" to be due to the unstable economic and financial conditions which faced the petitioners because of the delays caused by the City, and not because of a "voluntary choice" by the petitioners. The petitioners' situation is best described in the proverbial terms of being put between a "rock and a hard spot" by the City. The trial court also found that the petitioners had not surrendered the permit, whereas the District Court in effect found that such a surrender had been made on the basis of its reevaluation. Thus, the principles enunciated by this Court in Westerman, supra, and Greenwood, supra, require reversal on this point alone.
The doctrine of equitable estoppel may be invoked against a municipality as if it were an individual, Salkolsky v. City of Coral Gables;[7]Texas Co. v. Town of Miami Springs;[8]City of North Miami v. Marguiles;[9] and the City's contention that the doctrine is inapplicable where actual physical construction has not yet begun, is without merit. Salkolsky, supra; Bregar v. Britton;[10]Frink v. Orleans Corporation;[11]Marguiles, supra; City of Hollywood, supra; City of Gainesville v. Bishop.[12] As correctly stated by the Fourth District in City of Hollywood, supra, at 869, the doctrine of equitable estoppel will preclude a municipality from exercising its zoning power where
"... [A] property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right *16 he acquired. Salkolsky v. City of Coral Gables, 151 So.2d 433 (Fla. 1963)."
This Court has never had the occasion to decide if the exception to the Salkolsky rule alluded to, but not invoked, by the Fourth District should be established, i.e., that a city may revoke a building permit even after good faith reliance by the landowner on the zoning law and even after a substantial change has been made in his position or incurring extensive obligations, "... if the municipality can show that some new peril to the health, safety, morals, or general welfare of the municipality has arisen between the granting of the building permit and the subsequent change [in] zoning... ."[13]
While we cannot preclude the adoption of such an exception in the future, we have no reason to consider it in the instant case.
In applying the Salkolsky rule, the Fourth District found that,
"... [T]he plaintiffs obtained a building permit from the City of Hollywood on January 23, 1970. Without actual or constructive knowledge of any impending zoning change, the plaintiffs spent almost two hundred thousand dollars on a site plan, models of the community, architect's plans and specifications and building permits. This money was spent in good faith reliance on the city's rezoning of the plaintiffs' land to RC-12 multiple family. Under these circumstances the City of Hollywood was equitably estopped from changing the zoning of the plaintiffs' land from RC-12. The plaintiffs had a vested property right in the continuation of the RC-12 zoning."[14]
With this conclusion we agree. However, the District Court then held that
"...
"... [W]hen the city commission decided not to change the zoning classification of the plaintiffs' property and notified the plaintiffs that they could start construction under their building permit and the plaintiffs having elected not to proceed or initiate construction on the land and voluntarily surrendering their building permit to the city in March 1971, the plaintiffs thereby relinquished and forfeited their vested right under the building permit and in the continuance of the RC-12 zoning classification of their land. The city could then validly rezone plaintiffs' property from RC-12 to another classification."[15]
It would be unconscionable to allow such a holding to endure since it fails to take into account the unique facts which dominate the instant case. First, it is undeniable that the only circumstance which necessitated the ultimate rezoning was the adverse political climate which wrought the defeat of every commissioner who had voted for Ord. 0-69-46. Second, the delays caused by the City Commissioners in having allowed the appeal from the Zoning Board's denial of its rezoning petition to its own members sitting as the Board of Appeals to languish in limbo for some eleven months, were countenanced with a full understanding that any immediate rezoning would meet with adverse legal consequences. This conclusion is borne out by the City attorney's repeated warnings to the Commission that any such ordinance would be invalidated under this Court's decision in Salkolsky, supra. Thus, it is *17 clear that the City sought to accomplish by delay that which it could not effect by an immediate rezoning. Indeed, we must agree with the conclusion of the Fourth District that the City affirmed the Zoning Board's denial of its rezoning petition on February 17, 1971, only
"...
"After it became apparent to the city commission that the plaintiffs could not profitably carry out their project because of the prevalent poor economic conditions... ."[16]
It is only too clear that the City was aware of the adverse effects that the resulting delays were having on the petitioners' projects in light of the testimony adduced at the trial court's March 4, 1970, hearing on the City's motion to dismiss, i.e., that all activities had been brought to a halt until the City made up its mind; that a partial rezoning of the property would destroy the petitioners' site plan; and that a one-year delay in construction would add three quarters of a million dollars to the cost of the first building. It must, therefore, be assumed in light of this and other testimony that the Commission knew that the petitioners could not proceed to build or attract financing from potential investors until the matter of rezoning was definitely decided. It is also reasonable to assume that the City was aware that with each day it deferred action that the building market and the national economy were constantly deteriorating into a recessionary state.
It must also be remembered that at its February 17, 1971, meeting the Commission in one fell swoop without prior notice to the petitioners: affirmed after an eleven month delay the Zoning Board's denial of its petition to rezone; repealed its motion of July 15, 1970, which had extended the life of the permit until the completion of the litigation between the parties, and mandated that the petitioner proceed with construction within ninety days.
Under the circumstances, these actions were arbitrarily taken. The affirmance of the Zoning Board's decision had the dual effect of lifting the petitioners out of limbo but casting them into the depths of the inferno. This is especially true when the affirmance is coupled with the repeal of the motion extending the permit. Such an indefinite extension was a municipal action upon which the petitioners in good faith had substantially altered their position from one of readiness to build to one of necessarily dismantling their construction organization in order to actively assert their rights in the prosecution of their suit against the City. Such an action and reliance thereon satisfies the requirements of the Salkolsky rule.
The City's contention that the Commission intended this extension to remain in effect only until the end of the litigation on its interlocutory appeal is without merit. The motion was not so worded, but clearly stated that the permit was to be extended until the litigation between the parties was completed. If the City intended to limit this extension, it should have worded the motion accordingly. On this point, the applicable analogy must be drawn to the doctrine of statutory and constitutional interpretation of expressio unius est exclusio alterius. Furthermore, if the motion was so limited, its repeal would have been automatically affected when this Court notified the parties that we had denied certiorari, and there would have been no need for the Commission to expressly repeal the motion.
As noted previously, the suit was actively prosecuted by both parties during the ninety-day period and litigation thereon has continued up until the present time.
The mandated ninety-day period was an unreasonable lack of time in view of the above arbitrary actions by the City and its knowledge that it had taken the petitioners some nine or ten months to complete the necessary preparations to achieve a state of readiness to begin construction on January *18 23, 1970, when they paid some $15,000.00 for the building permit. Under these circumstances the petitioners' failure to build and even their request for the return of the permit fee, until economic conditions improved did not constitute a surrender of their permit or a relinquishment of their vested right in the continuance of the RC-12 zoning.
This Court would be undeserving of its equitable powers if we did not enjoin the two disputed ordinances. Indeed, as this Court stated in Texas Co., supra, at 809, we find the petitioners' cause to be "pregnant with equity." The arbitrary action by the City Commission sub judice has not even produced an embryo and thus will not be countenanced by this Court. Salkolsky, supra; Texas Co., supra.
Every citizen has the right to expect that he will be dealt with fairly by his government. Marguiles, supra, at 425-26. "Unfair dealing" by a municipality can also serve as the basis for the invokement of equitable estoppel. City of Jacksonville v. Wilson.[17] While a City Commission certainly possesses the prerogative of deciding to defer action on such a proposal over a long period of time, it must assume the attendant responsibility for the adverse effect it knows or should know its deliberate inaction will have upon the parties with whom it is dealing. In the instant case, the course of inaction chosen by the City and its subsequent arbitrary actions must necessarily be equated with "unfair dealing." Wilson, supra; Marguiles, supra.
For the reasons expressed in its opinion the District Court correctly reversed the chancellor's finding as a matter of law that the retention of the building permit fee by the City would constitute a forfeiture. City of Hollywood, supra, at 871. The case of City of Miami v. Miller,[18] relied upon by the petitioners, is inapplicable to the cause now before us. The record does not reveal whether or not the City has returned the fee to the petitioners. In the event the fee is in the petitioners' possession, it must be returned to the City, and in this regard the District Court is affirmed.
In other respects the opinion of the Fourth District Court of Appeal is quashed and this cause is remanded for entry of an opinion consistent with the views hereinabove expressed.
Affirmed in part and reversed in part.
It is so ordered.
ADKINS, C.J., ROBERTS and HATCHETT, JJ., and McCRARY, Circuit Judge, concur.
ENGLAND, J., dissents with an opinion, with which OVERTON and SUNDBERG, JJ., concur.
ENGLAND, Justice (dissenting).
I dissent. There is no direct conflict between the district court's decision and the decision of any other Florida appellate court. The majority below carefully analyzed the decisions alleged by petitioners as a basis for the exercise of our jurisdiction. It found, however, that they did not appropriately apply to command the result which petitioners there sought.
I view our constitutional role as being more narrow than providing litigants with a second appeal in select cases, as is done here, and I would discharge the writ of certiorari.
OVERTON and SUNDBERG, JJ., concur.
NOTES
[1] City of Hollywood v. Hollywood Beach Hotel, 283 So.2d 867 (Fla.App. 4th 1973).
[2] 265 So.2d 43 (Fla. 1972).
[3] 251 So.2d 665 (Fla. 1971). e.g. First Atlantic National Bank v. Cobbett, 82 So.2d 870 (Fla. 1955); In Re Baldridge's Estate, 74 So.2d 658 (Fla. 1954); Povia v. Melvin, 66 So.2d 494 (Fla. 1953); Ford Motor Co. v. Waters, 273 So.2d 96 (Fla.App.3d 1973); Nixon Construction Co. v. Dover, 218 So.2d 458 (Fla.App. 1st 1969); St. Paul Mercury Ins. Co. v. Conley, 201 So.2d 618 (Fla.App. 4th 1967); 2 Fla.Jur. Appeals, § 346 (1963).
[4] City of Hollywood, supra, at 868-870.
[5] Webster's Third New International Dictionary 731 (1961).
[6] Id. at 395.
[7] 151 So.2d 433 (Fla. 1963).
[8] 44 So.2d 808 (Fla. 1950).
[9] 289 So.2d 424 (Fla.App.3d 1974).
[10] 159 Fla. 646, 75 So.2d 753 (Fla. 1954).
[11] 32 So.2d 425 (Fla. 1947).
[12] 174 So.2d 100 (Fla.App. 1st 1965).
[13] City of Hollywood, supra, at 870 interpreting Texas Co., supra, at 809-810. It seems clear that this Court in Texas Co., supra, was speaking of the exception in the City's charter for the procedure of enacting emergency ordinances and not to an exception to the rule now under consideration.
[14] City of Hollywood, supra at 870. (Emphasis added.)
[15] Id.
[16] City of Hollywood, supra, at 868. (Emphasis added.)
[17] 157 Fla. 838, 27 So.2d 108 (1946).
[18] 148 Fla. 349, 4 So.2d 369 (1944).