[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 7, 2004
THOMAS  K. KAHN
CLERK

No. 03-11497

D. C. Docket No. 01-07951 CV-WJZ

CORAL SPRINGS STREET SYSTEMS, INC.,
a Florida corporation,

Plaintiff-Appellee,

versus

CITY OF SUNRISE,
a Florida municipality,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————

**(June 7, 2004)**

Before HULL, MARCUS and STAHL[*], Circuit Judges.

MARCUS, Circuit Judge:

—————

[*]Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

In this sign ordinance case, the City of Sunrise (the "City") appeals the district court's grant of final summary judgment in favor of the plaintiff, Coral Springs Street Systems, Inc. ("Coral Springs"). Coral Springs petitioned for equitable relief in the United States District Court for the Southern District of Florida, claiming that Article XIV of the City's Land Development Code (the "Sign Code") was unconstitutional in its entirety at the time that Coral Springs applied for and was denied a sign permit. After thorough review, we are convinced the case is moot and therefore nonjusticiable.

Before suit was even brought in this case, the old Sign Code was replaced by the City with an "Amended Sign Code" that eliminated most of the constitutionally infirm provisions; but the new Code unquestionably prohibited the sign that Coral Springs wants to erect. Moreover, there is no hint the City of Sunrise has any intention of reenacting the old Sign Code. And, as we read the law of Florida, Coral Springs acquired no vested right in a permit to build the sign, both because it has not relied detrimentally on the law as it existed under the old Sign Code and because the City has at no point acted in bad faith. Finally, portions of the Amended Sign Code that may be unconstitutional are fully severable from those that actually caused the permit to be denied. Accordingly,

2

we reverse the district court's grant of summary judgment and remand with instructions to dismiss for lack of subject matter jurisdiction.

**I**

The facts of this case are not in dispute. Coral Springs Street Systems is engaged in the business of constructing billboards on real estate that it buys or leases. On March 17, 1999, Street Information Systems, Inc., another billboard company not involved in this case, entered into a lease agreement with Sawgrass Ford, Inc., a car dealer located in the City of Sunrise. Under the terms of the agreement, Sawgrass Ford agreed to lease land on its property to Street Information Systems for twenty years, so that Street Information Systems could erect a billboard overlooking a busy thoroughfare, the Sawgrass Expressway.

Several provisions of the agreement violated the Sign Code. Among other things, the agreement provided for the construction of a "pole sign," which was prohibited under the Sign Code. Moreover, the Sign Code allowed only one sign to be erected on each piece of property, and Sawgrass Ford already had a sign, so the construction of another one plainly violated the Sign Code.

On August 1, 2000, Street Information Systems assigned its rights, title, and interest in the lease to the plaintiff Coral Springs. On September 6, 2001, Coral Springs applied for a permit to erect an "off-premises" outdoor advertising sign on a pole. At the top of the pole Coral Springs intended to place a two-sided, illuminated, 672-square-foot sign face. On September 18, the City verbally denied the application and, on November 13, the City confirmed the denial in writing, observing that the proposed sign would violate the Sign Code in no less than six different ways:

1. § 16-252 of the Sign Code allowed no sign to exceed 8.5 feet in height.[1] The sign Coral Springs applied for would have been 65 feet tall.

2. § 16-252 flatly prohibited any sign that exceeded eighty-five square feet in total surface area.[2] The proposed sign would have had an area of 672 square feet.

---

[1]Section 16-252 prescribed that the normal "Height Maximum" for signs was "6 ft." and that "[i]f a sign is to be located behind an existing required hedge or if visibility of an existing sign is blocked by an existing required hedge and the hedge has a minimum required height of thirty (30) inches or more, then the ground sign may have a maximum height of eight and one-half (8 ½) feet."

[2]Specifically, under § 16-252, the "Area maximum" for signs with "200 ft. or more of frontage" was "60 sq. ft.," and the maximum for signs with "less than 200 ft. of frontage" was "36 sq. ft." But for signs blocked by existing required hedges as described above, "the sign area shall not exceed fifty-one (51) square feet and frontage less than two hundred (200) feet, or eighty-five (85) square feet for frontage two hundred (200) feet or greater."

4

3. § 16-252 said that the "Number maximum" for "Nonresidential district permanent signs" was "1 per parcel with main street frontage." The proposed sign would in fact have been the second sign on the parcel.

4. § 16-248(a)(7) included "pole signs" on the list of "prohibited signs."[3] The proposed sign would have been mounted on a pole.

5. § 16-255 mandated specific landscaping designs for signs.[4] Coral Springs' proposed sign included no landscaping whatsoever.

6. § 16-248(a)(6) prohibited "[o]ff-premise commercial signs or billboards except bus shelter or bench signs, and temporary project sign [sic.]." Coral Springs' proposed sign was an off-premise commercial sign not falling within any of the exceptions.[5]

The Code also contained a number of other noteworthy provisions, not cited

as reasons for the rejection of Coral Springs' application, but otherwise attacked

---

[3] "The following signs are prohibited anywhere in the city:

. . . .

(7) Pole signs."

Sign Code § 16-248(a).

[4] "Landscaping of ground sign. If a ground sign is not placed in an area of required landscaping as contained in article VIII, then a planting bed at least two (2) feet in depth shall surround the sign. This bed shall contain shrubs and supplemental ground cover, and shall be shown on the site plan. If the base of the sign is less than thirty (30) inches, the landscaping must be equal to the height of the base, subject to approval by the planning and development department. In no case shall the planting be less than eighteen (18) inches in height." Sign Code § 16-255.

[5] The Code defined an "off-premise sign" as "[a]ny sign advertising a commercial establishment, activity, product, service or entertainment, which is sold, produced, manufactured, available or furnished at a place other than on the property on which the sign is located." Id. § 16-247(b)(24).

by Coral Springs as being unconstitutional.[6]  In response to the City's list of purported transgressions, Coral Springs' attorney wrote the City on November 25, 2001, claiming that the City's Sign Code violated the First Amendment.  Just sixteen days later, on December 11, the City amended the Sign Code, adopting Ordinance No. 402-01-K, § 1 (the "Amended Sign Code"), eliminating many of the allegedly unconstitutional provisions of the old Sign Code.  The Amended Sign Code substantively retained all the provisions of the Sign Code that were

[6]For example, § 16-248(a) of the Sign Code said that "[t]he following signs are prohibited anywhere in the city: . . . Animated or flashing signs . . . Banner signs . . . Buntings and flags . . . temporary and permanent signs, other than public interest signs, place[d] on any public property . . . [and] [a]ny sign not prescribed as a permitted sign by this article.  Id. § 16-248(a).  But § 16-248(a) also excepted certain signs from its prohibitions, including animated or flashing signs that display the time or temperature; temporary grand opening or special event banner signs; the United States flag; bus shelter or bench signs, and temporary project signs; and temporary and permanent public interest signs.  Id. § 16-248(a)(2), (3), (4), (6) & (12).

Section 16-250 permitted certain "Public interest signs," including "signs placed on bus benches[,] . . . [d]irectional signs for churches, schools or other like institutions[, and] [s]uch similar signs as the city commission deems appropriate."  Id. § 16-250(a).  Section 16-250 also permitted "[s]treet signs, traffic signs, directional and locational signs and roadside memorial signs placed by government agencies or with governmental approval"; "[i]nterior sign[s] within a lobby or courtyard not visible from public right of way"; and "[n]o-trespassing or no-dumping signs."  Id. § 16-250(b).  Section 16-253(a) permitted certain "[t]emporary signs," including "[g]rand opening banner sign[s]," "[m]odel signs," "[p]olitical sign[s]" (for 60 days before an election and 14 days after), "[r]eal estate sign[s]," "[c]ontractor sign[s]," "[g]arage sale sign[s]," "[p]roject sign[s]," "[s]pecial events sign[s]," and "[r]oadside memorial sign[s]."  With certain exceptions inapplicable  to Coral Springs, the Sign Code also provided that "it shall be unlawful for any person to erect, construct, enlarge, move or convert any sign in the city, or cause the same to be done, without first obtaining a sign permit for each such sign from the Department as required by the Code."  § 16-261(b)(1).

Notably, the Sign Code never laid out the specific grounds on which the City could reject sign permit applications, nor did it contain any provision requiring the City to make decisions on permit applications within a specific time limit.

6

cited in the rejection of Coral Springs' sign application.  Thus, § 16-252 of the Amended Sign Code prohibited signs over 8.5 feet high, or over 85 square feet in area, or more than one sign per parcel.  Section 16-248(6) prohibited "pole signs."  Section 16-255 set forth the exact same landscaping requirements contained in the Sign Code.  Section 16-247(b)(26) defined an "[o]ff-premise sign" as "[a]ny sign advertising a commercial establishment, activity, product, service or entertainment, which is sold, produced, manufactured, available or furnished at a place other than on the property on which the sign is located" -- exactly the same definition given to an "off-premise commercial sign" in the Sign Code.  And § 16-248 prohibited such "[o]ff-premises signs except temporary project signs."

The Amended Sign Code did make some significant changes.  The new Code said that "[n]otwithstanding any provisions of this article to the contrary, to the extent that this article contains a sign containing commercial copy, it shall permit a non-commercial sign to the same extent."  Amended Sign Code § 16-247(a).  The provision allowing temporary political signs imposed time limits on political signs only "[i]f the copy is related to an election."  Id. § 16-253.  The Amended Sign Code also specifically provided that the City "shall approve or deny the sign permit based on whether it complied with the requirements of this article," Id. § 16-261, and it required approval or denial of permit applications

7

within 30 days after receipt of an application.  Id.  Finally, the new Code expressly

provided for prompt appellate review of application denials by the city

commission and by the Circuit Court of Broward County.[7]

Notably, Coral Springs never reapplied for a permit under the Amended

Sign Code.  Instead, it filed suit in federal district court on December 31, 2001.  Its

argument essentially was that the Sign Code was unconstitutional on its face when

Coral Springs applied for the permit on September 6, 2001; that the

unconstitutional provisions of the Sign Code could not be severed from the

constitutional parts, meaning the entire statute was unlawful and therefore void;

and consequently, that there was no enforceable Sign Code in place at the time of

the application.  In short, the plaintiff said, the application satisfied all state laws

and the City had no valid basis for rejecting it, and, under Florida law, its right to

the building permit vested at the moment it submitted an application.  Finally,

---

[7]

The applicant may file a written notice of appeal to the city commission within fifteen (15) days after the receipt of the department's written notice.  The city commission shall hear the appeal and render a decision within thirty (30) days after the date of receiving the written notice of appeal.  If the city commission does not grant the appeal, then the applicant may seek relief in the Circuit Court for Broward County, as provided by law.

Amended Sign Code § 16-261.

Coral Springs claimed, parts of the Amended Sign Code remained unconstitutional.

The City responded that the lawsuit was moot because the City had amended the challenged Sign Code and Coral Springs had never reapplied for a permit under the new law. Furthermore, the City argued, the old Sign Code was constitutional anyway, and to the extent that parts of it may not have been, they were nonetheless severable from the remaining valid parts, which included all of the provisions cited by the City in denying Coral Springs' application. Finally, the City said, Coral Springs had no vested right to the approval of its permit.

On February 21, 2003, the district court granted summary judgment in favor of Coral Springs on all counts. See Coral Springs St. Sys., Inc. v. City of Sunrise, 287 F. Supp. 2d 1313 (S.D. Fla. 2003). Before deciding whether it had jurisdiction, the district court first ruled that the old Sign Code was unconstitutional. The court reasoned that the original Code favored commercial speech over non-commercial speech by prohibiting certain kinds of non-commercial signs, but not prohibiting any kind of commercial sign. Id. at 1319. In addition, the court found that the Code impermissibly restricted signs on the basis of content, because some noncommercial messages were permitted while others were not. Id.

As for mootness, the district court held that the case was justiciable. It wrote:

> The City argues that Coral Springs' claims are mooted by the enactment of the Amended Sign Code. The Eleventh Circuit has held that "when an application for a permit satisfies all existing and pending laws, the permit must then issue: a new law passed after the application was filed has no effect on the matter of issuance," Nat'l Adver. Co. v. City of Fort Lauderdale, 8 F. 3d 36 (11th Cir., Oct. 26, 1993) (per curiam) (unpublished table decision No. 92-4750). Here, Coral Springs applied for a permit prior to the enactment of the Amended Sign Code. The enactment of the Amended Sign Code, therefore, does not [a]ffect the issue of whether Coral Springs has a vested right in the permit for which it applied. Thus, the city's argument that Coral Springs' claims are moot fails.

Id. at 1319-20.

The district court concluded that because the unconstitutional portions of the Sign Code could not be severed from its constitutional parts and because Coral Springs' right to the permit categorically vested at the time it submitted its application, Coral Springs had a right to the permit. Id. at 1320-21. Accordingly, it granted summary judgment in favor of Coral Springs, ordering the City to issue the permit. Id. at 1321. The City then took this appeal.

**II**

10

Mootness is the threshold question in this case. Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). "Because the judiciary is unelected and unrepresentative, the Article III case-or-controversy limitation, as embodied in justiciability doctrine, presents an important restriction on the power of the federal courts." Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998). As the Supreme Court has put it, "the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are 'founded in concern about the proper -- and properly limited -- role of the courts in a democratic society.'" Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)). The powerful limitations that Article III places on the federal judiciary -- including the mootness doctrine -- relate to a centuries-old "idea . . . about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." Vander Jagt v. O'Neill, 699 F.2d 1166, 1179 (D.C. Cir. 1983) (Bork, J., concurring).

11

Plainly, if a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it. See Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001) (per curiam) ("[M]ootness is jurisdictional. Any decision on the merits of a moot case or issue would be an impermissible advisory opinion." (internal quotation marks and citations omitted)); Socialist Workers Party, 145 F.3d at 1244. Mootness can occur due to a change in circumstances, or, as here, a change in the law. As we have said, "[w]hen a subsequent law brings the existing controversy to an end the case becomes moot and should be treated accordingly." Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1310 (11th Cir. 2000) (citing Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 777 F.2d 598, 605 (11th Cir. 1985)) (internal quotation marks omitted). Therefore, we are required to address the jurisdictional question before we may consider the merits of the case.

We review the question of mootness de novo. Christian Coalition of Alabama v. Cole, 355 F.3d 1288, 1290 (11th Cir. 2004) (citing United States v. Fla. Azalea Specialists, 19 F.3d 620, 621 (11th Cir. 1994)). As we have noted, the City of Sunrise argues that this case is moot because it amended the Sign Code soon after the plaintiff complained about its constitutionality, and, notably, before

12

any lawsuit was filed. Coral Springs responds with two basic arguments: first, it says that a defendant's voluntary cessation of an illegal activity cannot moot a lawsuit because the activity can be resumed as soon as the case is dismissed; and second, it claims that, under Florida law, its right to a permit vested upon submitting its original application, and that we must therefore determine whether the old Sign Code was constitutionally valid in order to decide whether Coral Springs was entitled to a permit. We are persuaded by neither argument and, accordingly, hold that this case is moot.

## A. Voluntary Cessation

As for voluntary cessation, "[i]t has long been the rule that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.'" Sec'y of Labor v. Burger King Corp., 955 F.2d 681, 684 (11th Cir. 1992) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S. Ct. 894, 897, 97 L. Ed. 1303 (1953)). "Because of the possibility that the defendant could merely return to his old ways, [t]he test for mootness in cases such as this is a stringent one. . . . A case might become moot if subsequent events made it absolutely clear that the allegedly

13

wrongful behavior could not reasonably be expected to recur." Id. (alteration in original) (internal quotation marks and citation omitted). However, governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities. See Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

Generally, a challenge to the constitutionality of a statute is mooted by repeal of the statute. In Coalition for the Abolition of Marijuana Prohibition, for example, a panel of this Court said that "when an ordinance is repealed by the enactment of a superseding statute, then the 'superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law.'" 219 F.3d at 1310 (quoting Naturist Soc'y, Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th Cir. 1992)). Moreover, on numerous occasions, the Supreme Court has held that the repeal of or amendment to challenged legislation rendered moot a plaintiff's request for injunctive relief. See, e.g., Lewis v. Cont'l Bank Corp., 494 U.S. 472, 474, 110 S. Ct. 1249, 1252, 108 L. Ed. 2d 400 (1990) (holding that a Commerce Clause-based challenge to Florida banking statutes was rendered moot by amendments to the law); Massachusetts v. Oakes, 491 U.S. 576, 582-83, 109 S.

14

Ct. 2633, 2637-38, 105 L. Ed. 2d 493 (1989) (holding that an overbreadth challenge to a child pornography law was rendered moot by amendment to the statute); Princeton Univ. v. Schmid, 455 U.S. 100, 103, 102 S. Ct. 867, 869, 70 L. Ed. 2d 855 (1982) (per curiam) (holding that the challenge to a university regulation was moot because the regulation had been substantially amended); Kremens v. Bartley, 431 U.S. 119, 128-29, 97 S. Ct. 1709, 1715, 52 L. Ed. 2d 184 (1977) (holding moot a constitutional challenge to a state statute governing the involuntary commitment of mentally ill minors, because the law had been replaced with a different statute); Diffenderfer v. Cent. Baptist Church, Inc., 404 U.S. 412, 415, 92 S. Ct. 574, 576, 30 L. Ed. 2d 567 (1972) (holding moot a challenge to a Florida tax exemption for church property when the law had been repealed).

An important exception to this general rule applies if there is a substantial likelihood that the challenged statutory language will be reenacted. Thus, in City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982), the Supreme Court denied a mootness claim even though the challenged law was no longer in effect. In that case -- a void-for-vagueness challenge to a city statute -- the ordinance had been amended and the challenged language repealed by the time the case was decided by the Court of Appeals. Id. at 288. The Supreme Court nonetheless concluded that the case was not moot, because

15

"the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision." Id. at 289. The Court observed that "[t]here is no certainty" that this reenactment would not occur. Id. Indeed, in contrast to the cases cited above, in Mesquite, the Court noted that the City had expressly announced an intention to reenact the old language if the Court vacated the district court's holding that the language of the statute was unconstitutionally vague. Id. at 289 & n.11. Plainly, Mesquite differed from Lewis, Oakes, and the others because the Court found that if it held there was no jurisdiction to evaluate the case on the merits, then the challenged law would be reenacted.

Similarly, in Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Fla., 508 U.S. 656, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993), the Supreme Court declined to find moot a challenge to a minority set-aside program even though the challenged law had been repealed, because it had been replaced with a law that, although somewhat narrower, still had the potential to disadvantage the plaintiff: "There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so." Id. at 662, 113 S. Ct. at 2301.

In general, then, the Supreme Court has declined to hold moot a challenge to a repealed law only when the law is reasonably likely to be reenacted or when it

16

is replaced by another constitutionally suspect law. <u>See also</u> 13A Wright et al.,

<u>Federal Practice and Procedure</u> § 3533.7 (2d ed. 2004) ("The determination

whether discontinuance moots a case is apt to be affected by the distinction

between public and private defendants. Courts are more apt to trust public officials

than private defendants to desist from future violations."). Likewise, this Court

has repeatedly held that the doctrine of voluntary cessation does not apply in cases

where challenged laws have been repealed unless there is some reason to believe

that the law may be reenacted after dismissal of the suit. Thus, for example, in

<u>Jews for Jesus v. Hillsborough County Aviation Authority</u>, 162 F.3d 627 (11th

Cir. 1998), we held that where a public airport had lifted a prohibition on

distributing literature after a complaint had been filed, the issue of whether the

prior policy was constitutional was "a purely academic point" and was accordingly

moot, precisely because there was "no reasonable expectation that the challenge

[would] resume after the lawsuit [was] dismissed." <u>Id.</u> at 629 (citation and

quotation marks omitted). In reaching this conclusion, we considered the fact that

the changed policy was the result of "substantial and conscientious deliberation,"

and had been "consistently applied" since its enactment. <u>Id.</u>

We recently came to the same result in <u>Christian Coalition of Alabama v.

Cole</u>, 355 F.3d 1288 (11th Cir. 2004). The Christian Coalition of Alabama

challenged an advisory opinion from the Alabama Judicial Inquiry Commission ("JIC") regarding public statements by candidates for judicial office. In response to the Supreme Court's decision in <u>Republican Party of Minnesota v. White</u>, 536 U.S. 765, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002), the JIC withdrew its advisory opinion. The district court in <u>Christian Coalition</u> granted the defendant's motion to dismiss because the case was moot, and the Eleventh Circuit affirmed.

A panel of this Court said that "[o]nly when 'the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated"' are federal courts precluded from deciding the case on mootness grounds." <u>Id.</u> (quoting <u>W.T. Grant Co.</u>, 345 U.S. at 633, 73 S. Ct. at 897 (quoting <u>United States v. Aluminum Co. of Am.</u>, 148 F.2d 416, 448 (2d Cir. 1945))). In that case, we found the possibility slim indeed: "[T]he JIC members have stated no intention to reenact their Advisory Opinion. Instead, the JIC members have professed the contrary intent, stating in a pleading submitted to the district court that they 'hereby represent that the JIC will not file charges against any judge in connection with the CCA questionnaire.'" <u>Id.</u> at 1292. This was especially the case since, in light of the Supreme Court's ruling in <u>White</u>, the Alabama Supreme Court's Committee on the Canons decided to reevaluate the Canons on which the JIC based its advisory opinions. <u>Id.</u> For that reason, we were fully satisfied that "the

18

CCA has every reason to believe that the JIC's representation is genuine, and can reasonably expect that the JIC will not issue another opinion preventing judges from answering the questionnaire at issue in this case." Id. at 1292-93.[8]

Whether the repeal of a law will lead to a finding that the challenge to the law is moot depends most significantly on whether the court is sufficiently convinced that the repealed law will not be brought back.[9] In National

---

[8]We reached a similar result on a challenge of a sign ordinance in Revolution Outdoor Advertising, Inc. v. City of Casselberry, No. 00-10863 (11th Cir. 2000) (unpublished opinion). The plaintiff challenged the City's sign code, and four months after the filing of the complaint the City amended its ordinance, designed to remedy the alleged constitutional problems of the old sign code. The City then moved for summary judgment, and the district court granted it on mootness grounds. The district court did not apply the voluntary cessation doctrine, observing that "Plaintiff offers no evidence showing that Defendant's course of conduct is actually a strategic ploy designed to defeat jurisdiction in this case. Instead, the evidence establishes just the opposite." Revolution Outdoor Adver., Inc. v. City of Casselberry, No. 98-01344 (M.D. Fla. 2000), at 6-7. The court reached this conclusion because the City had placed a moratorium on the old sign ordinance prior to the commencement of the litigation, because the new sign code was the product of "substantial deliberation," and because the City adopted a formal resolution that it would not readopt any aspect of the old sign code that might violate the First Amendment. Id. at 7. The Eleventh Circuit affirmed, saying simply that "[t]here is no indication from the record that the City has any intention of reenacting the challenged portions" of the repealed ordinance. Revolution, No. 00-10863 at 2.

[9]We add that our view of the law as to voluntary cessation by governmental actors is altogether consonant with that of every other Federal Circuit to address the issue. The federal courts of appeal have virtually uniformly held that the repeal of a challenged ordinance will moot a plaintiff's request for injunctive relief in the absence of some evidence that the ordinance has been or is reasonably likely to be reenacted. See, e.g., Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago, 326 F.3d 924, 930 (7th Cir. 2003) (holding that a suit became moot when the challenged ordinance had been repealed and saying that "we have repeatedly held that the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar"); Citizens for Responsible Gov't v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000) (concluding that a challenge to the constitutionality of certain sections of the Colorado Fair Campaign Practices Act were moot because those sections had been repealed, and saying that "[i]n general,

19

Advertising Company v. City of Ft. Lauderdale, 934 F.2d 283 (11th Cir. 1991)

[hereinafter "National I"], we evaluated a challenge to a city's repealed sign code.

National, another outdoor advertising company, filed suit against the City of Fort

Lauderdale, challenging its sign ordinance on First Amendment grounds. Id. at

284. After filing suit, it applied for permits to erect twenty billboards containing

both commercial and non-commercial messages. Id. The City's sign code

specifically prohibited billboards, and the applications were rejected the same day

they were submitted. Id. National then sought review by the City's Board of

Adjustment, which characterized the action as a request for a variance under the

---

the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur" (internal quotation marks omitted)); D.H.L. Assoc. v. O'Gorman, 199 F.3d 50, 55 (1st Cir. 1999) (examining the claim of a property owner who had brought a state court action against town and town officials, challenging a zoning ordinance that regulated adult entertainment businesses, and holding the suit moot, because challenges to repealed laws are normally moot, and the court found that "it would be unreasonable to presume that the Town would return to its prior zoning plans after the conclusion of this litigation"); Nat'l Black Police Ass'n v. Dist. of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) (holding that a challenge to the constitutionality of a voter initiative restricting campaign contributions for local political candidates was mooted by the passage of legislation increasing contribution limits, because there was no "evidence indicating that the challenged law likely will be reenacted"); Ky. Right to Life, Inc. v. Terry, 108 F.3d 637, 645 (6th Cir. 1997) (holding moot a challenge to a campaign finance law because the law had been repealed and the state had announced no intention to reenact it); Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994) (holding that "[a]s a general rule, if a challenged law is repealed or expires, the case becomes moot" except where "it is virtually certain that the repealed law will be reenacted"); Assoc. Gen. Contractors of Conn., Inc. v. City of New Haven, 41 F.3d 62, 66 (2d Cir. 1994) (holding moot an action challenging the constitutionality of a city ordinance setting aside a percentage of city contracts for women-owned and disadvantaged business enterprises because the ordinance had expired and there was no evidence it would be reenacted).

City's zoning regulations.  Id.  Following several steps in the application process, National's requests were rejected by the Board.  Id.

About six weeks after it was sued, the City of Fort Lauderdale amended its sign code to remove the constitutionally objectionable provisions.  Id. at 284-85. The very next day, it filed a suggestion of mootness and a motion to dismiss on the grounds that the amendments remedied any constitutional infirmities which may have disabled the original ordinance.  Id.  The district court granted the motion, but a panel of this Court reversed and remanded.  Addressing whether the amendment to the sign ordinance rendered the case moot, we stated:

> The City presently possesses the power and authority to amend the sign code. It remains uncertain whether the City would return the sign code to its original form if it managed to defeat jurisdiction in this case. Neither the City nor the district court has established that the likelihood of further violations is sufficiently remote to dismiss National's claims.

Id. at 286.  We therefore rejected the defendant's suggestion that the suit was moot because there was a not-insubstantial chance that the law would be reenacted. This finding was undoubtedly informed by the timing of the change in the law -- well after suit had already been brought, which reasonably led the Court to doubt the City's sincerity.

The essential difference between the circumstances we found in the Jews for Jesus, Christian Coalition, and Revolution cases and those in National I is that in the first three cases, there was no reasonable chance that the challenged policy would be reinstated.   In Jews for Jesus, we wrote that "voluntary cessation of a challenged practice renders a case moot only if there is no 'reasonable expectation' that the challenged practice will resume after the lawsuit is dismissed."   162 F.3d at 630 (citing County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979); W.T. Grant Co., 345 U.S. at 633, 73 S. Ct. at 897).  In making this clear finding, we expressly distinguished the facts in Jews for Jesus from those encountered in National I, characterizing National I as having held that that case was not moot "because there was a reasonable expectation that the challenged conduct would recur."  Id.

Just as the circumstances in Jews for Jesus, Christian Coalition, and Revolution convinced us of the genuineness of the defendant's representation that the challenged law or advisory opinion would not be reenacted, we are persuaded today that the City of Sunrise will not bring back the Sign Code.[10]  In the first

---

[10]We note in passing that on numerous occasions, appellate courts have made this critical determination of whether reenactment of the challenged law was likely, without remand or deference to the district courts.  See, e.g., Christian Coalition, 355 F.3d at 1292-93 ("[T]he [plaintiff] has every reason to believe that the [defendant]'s representation is genuine, and can reasonably expect that the [defendant] will not issue another opinion preventing judges from answering the questionnaire at issue in this case."); Jews for Jesus, 162 F.3d at 630 ("The district

place, at oral argument, counsel for the City expressly disavowed any intention of defending the old Sign Code, and the City's brief repeatedly represented that there was "no indication whatsoever that the City would reenact the Sign Code in the future." Def. Brief at 19. More significantly, here the City promptly amended the Sign Code in response to a single letter from the plaintiff, and, notably, before it had ever been sued. The City's behavior stands in stark contrast to that of the defendant in National I, which did not change the offending law until six weeks after it had been sued, and moved to dismiss the day after the change. Indeed, the City of Sunrise altered its Sign Code with nary a whimper of protest after Coral Springs' counsel sent the City a letter objecting to it. It did so within sixteen days of receiving the letter. On this record, we can discern absolutely no indication -- and Coral Springs does not even try to argue -- that the City repealed its old Sign Code in bad faith, intending to reinstate it later, just as soon as the threat of a lawsuit had abated.

---

court found that there was no reasonable expectation that the Tampa International Airport would return to its prior policy. We agree. . . . Because there is no reason to think that the airport will change its policy at the conclusion of this lawsuit, we affirm the district court's dismissal of the suit as moot."); Revolution, No. 00-10863, at 3 ("There is no indication that the City has any intention of reenacting the challenged portions of the 1992 Ordinance."). On the peculiar facts and circumstances of this case, we can discern no reason not to make a determination of this kind.

Moreover, if the City of Sunrise did somehow nurture the intention of reinstating the old, purportedly unconstitutional Sign Code, and actually adopted the Amended Sign Code as a temporary measure whenever another lawsuit appeared on the horizon, we would plainly forbid it from doing so. In Jews for Jesus, 162 F.3d at 630, we specifically warned against the possibility of this kind of "flip-flopping." Accordingly, the voluntary cessation doctrine is inapplicable, and will not save this case from a mootness determination.

## B. Vested Rights

Coral Springs also says that its lawsuit has not become moot because, under Florida law, its right to the sign permit vested at the time of application, so that any subsequent changes to the relevant law would not affect whether it is entitled to the permit. Not surprisingly, vested rights are not created easily. A "vested right" has been defined as "[a] right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Black's Law Dictionary (7th ed. 1999). Whether the right to a permit has vested is a question of state law. As the Supreme Court has said, "[p]roperty interests, of course, are not created by the Constitution. Rather they are created and their

24

dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972); see also Reserve, Ltd. v. Town of Longboat Key, 17 F.3d 1374, 1379 (11th Cir. 1994). In ascertaining Florida law, we look to both the state's Supreme Court and, where necessary, its District Courts of Appeal. See Veale v. Citibank, F.S.B., 85 F.3d 577, 580 (11th Cir. 1996) ("In matters of state law, federal courts are bound by the rulings of the state's highest court. If the state's highest court has not ruled on the issue, a federal court must look to the intermediate state appellate courts." (citing Huddleston v. Dwyer, 322 U.S. 232, 236, 64 S. Ct. 1015, 1017-18, 88 L. Ed. 1246 (1944); Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177-78, 61 S. Ct. 176, 177-79, 85 L. Ed. 109 (1940))).

There is no question that an unconstitutional statute is void under state law. See Bhoola v. City of St. Augustine Beach, 588 So. 2d 666 (Fla. Dist. Ct. App. 1991) (holding that a city ordinance passed in violation of law "is not voidable, -- it is void"); see also Josephson v. Autrey, 96 So. 2d 784, 789 (Fla. 1957) (en banc) (stating that an unlawful ordinance "can have no effect whatsoever"). It follows that a city may not withhold an application on the basis of a void ordinance, and

under certain circumstances, this can give rise to a vested right in the permit. The question, then, is when such a right is created under Florida law.

A long line of Florida cases has evaluated the question of when a party acquires a vested right to such things as sign permits, building (construction) permits, and liquor licenses.[11] The overarching pattern in Florida's case law is that vested rights can be created -- thus creating an enforceable entitlement in the face of subsequent changes in the law -- only in two circumstances. The first and more common way a vested right is created occurs when a party has reasonably and detrimentally relied on existing law, creating the conditions of equitable estoppel. In the second, less common case, a vested right may be created in the absence of a showing of detrimental reliance when the defendant municipality has acted in a clear display of bad faith. As best we can tell, absent either a finding of equitable estoppel or bad faith, no Florida court has ever found a vested right to exist in a sign permit or similar entitlement. In this case we can find neither equitable estoppel nor bad faith, and, accordingly, Coral Springs does not have a vested right to a sign permit.

---

[11] A review of Florida's case law suggests little distinction among the rights enjoyed by applicants for construction permits, those enjoyed by applicants for sign permits, and those enjoyed by applicants for liquor licenses. The cases cite each other as if the relevant entitlements were more or less interchangeable, which suggests that the same case law as to vested rights applies equally to all.

26

## 1. Equitable Estoppel

In the majority of Florida cases finding that a party holds a vested right to a construction permit or similar entitlement, the conditions of equitable estoppel were met. The Florida courts have made it abundantly clear that when a property owner incurs a substantial investment of time or money in reasonable reliance on existing laws and with no reason to know that the laws are likely to change, he may acquire a vested right in a building permit. Thus, under Florida law, the doctrine of equitable estoppel may be invoked against a local government "when a property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right he acquired." City of Hollywood v. Hollywood Beach Hotel Co., 283 So. 2d 867, 869 (Fla. Dist. Ct. App. 1973) (citing Sakolsky v. City of Coral Gables, 151 So. 2d 433 (Fla. 1963)), aff'd in part and rev'd in part on other grounds, 329 So. 2d 10 (Fla. 1976). More broadly, the Second District Court of Appeal described equitable estoppel, quoting the lower court, in these terms:

> "Stripped of the legal jargon which lawyers and judges have obfuscated it with, the theory of estoppel amounts to nothing more than an application of the rules of fair play. One party will not be permitted to invite another onto a welcome mat and then be permitted to snatch the mat away to the detriment of the party induced or

permitted to stand thereon. A citizen is entitled to rely on the assurances or commitments of a zoning authority and if he does, the zoning authority is bound by its representations, whether they be in the form of words or deeds . . . ."

Town of Largo v. Imperial Homes Corp., 309 So. 2d 571, 573 (Fla. Dist. Ct. App. 1975) (alteration in original).

Thus, for example, in Hollywood Beach Hotel Co. v. Hollywood Beach Hotel Co., 329 So. 2d 10 (Fla. 1976) (per curiam), the plaintiffs spent almost $200,000 and nine or ten months of time in preparation for construction of a large residence building, in good faith reliance on a rezoning and permit.  Id. at 12.  But then the City (after political upheaval that resulted in the electoral defeat of every Commission member who had voted for the ordinance) reconsidered its rezoning, and the plaintiffs eventually sued for a permanent injunction to construct the building.   The Florida Supreme Court concluded that the City's actions in delaying the plaintiffs' ability to begin construction constituted "unfair dealing," and therefore invoked the principle of equitable estoppel.  Id. at 18.

Likewise, in Sakolsky, a plaintiff became interested in constructing a luxury apartment building in Coral Gables.   151 So. 2d at 434.  He met with the City's mayor to discuss his plans, and then bought a tract of land.  Id.  Upon notice and a public hearing, the City Commission voted to issue a permit for the construction of

28

a 12-story apartment building on the property.  Id.  According to the Florida Supreme Court, it was "uncontroverted that petitioner changed his position materially and incurred very substantial expense in reliance upon the permission granted and permit issued by the respondent City."  Id. at 434-35.  But at a meeting held several weeks after the permit had been issued, the City Commission, upon motion by a member whose opposing vote had at the December meeting been overridden, passed an ordinance rescinding petitioner's permit.  Id. at 435.  After losing in the lower courts, Sakolsky appealed to the Supreme Court of Florida, which again held that "[t]he law is clearly established that the doctrine of equitable estoppel may prevent arbitrary rescission of a permit by a municipality."  Id.  The Court concluded that "[Sakolsky] acted in good faith and should not be denied the benefit of the estoppel doctrine upon which his complaint is founded."  Id. at 436.

Similar conditions of reliance and estoppel have been found in the vast majority of the other Florida cases.  See, e.g., Texas Co. v. Town of Miami Springs, 44 So. 2d 808, 809 (Fla. 1950) (holding that because oil company spent $12,500 to build gas stations, the case was "pregnant with equity," and "a typical case of estoppel"); Bregar v. Britton, 75 So. 2d 753, 756 (Fla. 1954) (plaintiff spent about $28,000 to build drive-in movie theater, thus giving rise to equitable

29

estoppel); Imperial Homes, 309 So. 2d at 572-73 (plaintiff spent over $379,000 in

reliance on existing zoning laws); Equity Resources, Inc. v. County of Leon, 643

So. 2d 1112, 1119 (Fla. Dist Ct. App. 1994) (holding a vested right to exist when

"the county continuously issued permits for the unrestricted construction of the

project over a period of 18 years with knowledge of expenditures for

improvements to be made for the benefit of" the plaintiff's land).[12]

---

[12]Federal courts, sitting in equity and evaluating Florida law on vested rights, also have generally invoked the doctrine of equitable estoppel. See, e.g., Reserve, Ltd. v. Longboat Key, 17 F.3d 1374, 1380-81 (11th Cir. 1994) (finding that under Florida law the plaintiff had a vested property right to a building permit because it possessed such a permit and expended large sums of money in reliance on it, and saying that the Florida courts "have consistently held that a landowner has a property right in a building permit where the landowner possesses a building permit and where the circumstances that give rise to the doctrine of equitable estoppel are present" (emphasis added) (internal quotation marks omitted)); A.A. Profiles, Inc. v. City of Ft. Lauderdale, 850 F.2d 1483, 1488 (11th Cir. 1988), cert. denied, 490 U.S. 1020, 109 S. Ct. 1743, 104 L. Ed. 2d 180 (1989) (in a takings suit, holding that a landowner had property rights in a proposed development, in part because of the substantial expense incurred after the granting of the permits); Henniger v. Pinellas County, 7 F. Supp. 2d 1334 (M.D. Fla. 1998) (holding that equitable estoppel applied, creating a vested right in a building permit after the plaintiff had reasonably relied on the issuance of a permit to build a poolhouse and begun construction); Decarion v. Monroe County, 853 F. Supp. 1415, 1418-19 (S.D. Fla. 1994) (finding a vested right when the plaintiffs had spent and obligated $2 million in reasonable reliance on the county's final approval of its development plans); Hy Kom Development Co. v. Manatee County, 837 F. Supp. 1182, 1187 (M.D. Fla. 1993) (finding equitable estoppel to be present in a § 1983 suit alleging violations of due process and equal protection when the county invalidated a developer's building permit, awarding a developer a property right in a building permit after it spent $2.5 million in reasonable reliance on the permit to build a condominium apartment building).

The converse is equally true: in the absence of equitable estoppel, Florida's courts have consistently denied vested rights. See, e.g., City of Gainesville v. Cone, 365 So. 2d 737, 739 (Fla. Dist. Ct. App. 1978) (denying claim for vested rights in existing zoning laws because "[a]n owner of property acquires no vested rights in the continuation of existing zoning or land use regulations as to such property unless matters creating an estoppel against the zoning authority have arisen"); City of Ft. Pierce v. Davis, 400 So. 2d 1242, 1244 (Fla. Dist. Ct. App. 1981) (holding that $4,000 that the plaintiff spent, most of it after the plaintiff had notice of the City's intent to change, was not enough to trigger equitable estoppel).

## 2. Bad Faith

Florida's courts also have created a vested right in a smaller number of cases, in the absence of estoppel, where the defendant municipality acted in blatant and obvious bad faith in denying a permit or license. Bad faith was evinced by the fact that the municipality did not change the relevant law until after the plaintiff had both sued and obtained a writ from a state court of general jurisdiction, or because the county deliberately withheld a permit it otherwise would have awarded until after a voter-approved moratorium went into effect.

In the early days of the automobile, the Florida Supreme Court evaluated the case of Aiken v. E.B. Davis, Inc., 143 So. 658 (Fla. 1932) (en banc) (per curiam). The plaintiff applied for a permit to build a "filling station" in an area where there was no relevant zoning law in effect. But after he applied, the town council of Boca Raton passed an "emergency ordinance" (later made permanent) placing the lot of land into a residential zone that prohibited the construction of a filling station. The plaintiff then obtained a  peremptory writ of mandamus to compel the City to issue a permit, with the lower court saying that "the municipality acted unreasonably and arbitrarily." Id.  The Supreme Court of Florida affirmed.  One concurrence (speaking for four justices) said that changing the zoning law was "an attempted judicial decree by the legislative power of the city against the then existing rights of the relator, and therefore that such ordinance as applied to relator, is unreasonable and arbitrary." Id. at 658-59 (Davis, J., concurring) (emphasis omitted).  Another concurrence said that the town's motivation in trying to prohibit a filling station was purely aesthetic in nature, with an "obvious lack of any emergency existing in the interest of public health or convenience" and was therefore not a proper use of the town's police power to pass zoning laws. Id. at 659 (Ellis, J., concurring).

32

The overriding principle of <u>Aiken</u> is that a vested right was created because the town wrongly singled out the plaintiff and hastily passed a new ordinance for the purpose of preventing the construction of a filling station despite no evident public benefit in this change. The City had no zoning ordinance in place, and it decided, only after receiving the application to build a filling station, to suddenly put a new law into effect that would bar its construction. The Florida Supreme Court determined that this post-hoc change in the law could not stand.

The Florida Supreme Court reached a similar result fifteen years later, in <u>Harris v. State ex rel. Webster</u>, 31 So. 2d 264 (Fla. 1947). Webster applied for and was denied a liquor license. <u>Id.</u> at 265. He then petitioned for a writ of mandamus challenging the validity of the City's liquor licensing ordinance under the state liquor law. <u>Id.</u> The trial court agreed and issued the writ, and in response, the City changed the ordinance, replacing it with a valid one that would have disallowed the type of license Webster had initially sought. <u>Id.</u> at 266. The Florida Supreme Court ordered the City to grant him a liquor license, citing <u>Aiken</u> as having held:

> [T]he rights of a relator in a mandamus suit, claim for which was asserted by an alternative writ granted and served prior to action taken by the respondent city and its officials in an effort to avoid having to comply with its commands, would be affected by any such subsequent action, and that a peremptory writ would issue in

33

accordance with the alternative writ though the action taken, had it occurred before the issuance of the alternative writ, would have been a good defense.

Id. at 266 (emphasis added). The state Supreme Court thus said that a change in law that took place before a court order compelling the grant of the permit would have constituted a defense against the claim. See also Broach v. Young, 100 So. 2d 411, 414 (Fla. 1958) (Drew, J., dissenting) ("The Aiken and Harris cases place this Court with those that hold that if the application is unreasonably refused or delayed and the subsequent ordinance enacted in bad faith, the law at the time of the application should be applied."); City of Margate v. Amoco Oil Co., 546 So. 2d 1091, 1092-94 (Fla. Dist. Ct. App. 1989) (affirming an order for injunctive relief in which the trial court found that the City acted "'arbitrarily, capriciously, discriminatorily and illegally' in denying the permit" to build a gas station because "the City illegally denied a permit that should have been issued and then tried to pass ordinances that would authorize a denial," thus exhibiting "bad faith and an avoidance of duty, such that estoppel should apply"); Dade County v. Jason, 278 So. 2d 311, 311-12 (Fla. Dist. Ct. App. 1973) (per curiam) (ordering the County to grant the plaintiffs a building permit that the County had deliberately withheld until a building moratorium went into effect, because "the County had acted in

Bad faith in delaying the issuance of the permit and, therefore, the applicant should have been entitled to a permit").

In each of these cases, the defendant municipality changed the law in a last-ditch effort to avoid granting a permit or license to a plaintiff. Whether this took the form of an "emergency ordinance" passed while the application was pending (Aiken), or a change in the law after a writ had already been issued by a court (Harris), or selective and erroneous enforcement of an arguably unconstitutional provision of the law (Margate), or, finally, deliberate delay of the issuance of a permit until after a building moratorium went into effect (Jason), the government's behavior was entirely different from the City of Sunrise's change in the law, which was made promptly, after the City received a single letter and before it was sued.

Conversely, in the absence of bad faith or reasonable reliance on existing law, Florida's courts have consistently refused to find a vested right. See, e.g., Davidson v. City of Coral Gables, 119 So. 2d 704, 708 (Fla. Dist. Ct. App. 1960) (per curiam) (citing Harris and Aiken as having held that a repealed liquor licensing law, rather than a new one, can apply to a plaintiff only "when the officials or governmental body to whom an application for a liquor license has been made, and against whom suit is filed to enforce its issuance, act arbitrarily to avoid their duty," and that "it is a question for the court as to whether the

35

subsequently enacted limitations or regulations were made arbitrarily or in bad faith"); City of Miami v. State ex rel. Ergene, Inc., 132 So. 2d 474, 476 (Fla. Dist. Ct. App. 1961) (per curiam) (in a zoning variance case, denying that the plaintiff had vested rights in a zoning variance allowing it to construct a gas station because "[w]e do not view the circumstances in this case as constituting arbitrary or bad faith acts on behalf of the city as was the circumstance in [Aiken, Harris, and Broach]"); City of Miami Beach v. 8701 Collins Ave., Inc., 77 So. 2d 428, 429-31 (Fla. 1954) (denying equitable estoppel in previous zoning regulations even though the plaintiff had spent $250,000 in reliance on them, because the City had no knowledge of these expenditures when it changed the law); City of Miami Beach v. Jonathon Corp., 238 So. 2d 516, 519-20 (Fla. Dist. Ct. App. 1970) (rejecting the claim that a vested right in a permit was created at the moment of application regardless of later acts by the City, in the absence of a showing of bad faith or arbitrariness); City of Boynton Beach v. Carroll, 272 So. 2d 171, 172-73 (Fla. Dist. Ct. App. 1973) (when the plaintiff tried to rush through a building permit application before the City's new zoning ordinance took effect, knowing that the ordinance would forbid him from building the desired seven-story retirement home, the court said that "Florida law since 1945 has been clear that possession of a building permit does not create a vested right, and that a permit

36

may be revoked where the zoning law has been amended subsequent to the issuance of the permit in the absence of . . . equitable estoppel"); Smith v. City of Clearwater, 383 So. 2d 681, 688-89 (Fla. Dist. Ct. App. 1980) (noting an interplay between "those situations in which the city is estopped because the property owner has spent large sums in reliance on the city's original position and those in which the city refuses to issue a permit for a use which is permissible under existing zoning," and denying the plaintiffs a right to their development plans because they previously had notice of the impending changes).

## 3. Application of Florida Law to This Case

Simply put, an extensive canvass of Florida's law establishes this: a party will be found to have a vested right in a permit or in a similar entitlement only if (1) it has incurred substantial expense in reasonable reliance on existing law; or (2) the city has passed a subsequent ordinance in a bad faith effort to prevent the property owner from obtaining a permit. Neither circumstance is present here.

First, there was clearly no equitable estoppel, because Coral Springs incurred no significant expenses in reliance on the previous law -- indeed, under its lease, no money is paid to Sawgrass Ford until the billboard gets built. Coral

Springs does not even try to argue that equitable estoppel is present, and we see nothing in the record that would suggest otherwise.

Second, the City has not displayed bad faith. Facing an objection to its Sign Code, the City did exactly what it should have done: it amended the Code to eliminate constitutionally questionable provisions. It did so not for the purpose of resolving pending litigation, because no litigation existed at the time the Amended Sign Code was passed. And the change in law did not arbitrarily single out Coral Springs in the way that the defendants in Aiken, Harris, Margate, and Jason did. In fact, the situation here is nearly the opposite, because in passing the Amended Sign Code, the City did not make any changes to the provisions of the old Sign Code that actually caused the denial of Coral Springs' application. The Amended Sign Code prohibits signs that are more than 85 square feet, 8.5 feet tall, off-premise commercial signs, and so forth -- just as the old Sign Code did. Indeed, as we see it, the allegedly unconstitutional aspects of the old Sign Code had nothing whatever to do with the rejection of the plaintiff's application.

Notably, in response to the passage of the Amended Sign Code, Coral Springs did not reapply for a sign permit -- indeed, it knew it could not (at least for the sign it wanted to erect), because the provisions of the Sign Code that caused the denial of its initial application were constitutionally sound, and were retained

38

in the Amended Sign Code. Instead, Coral Springs chose to sue in order to force the approval of a sign that it knew was impermissible under various provisions of both versions of the Sign Code. No Florida court has ever held or even hinted that under circumstances like these a vested right could be created.

The district court, agreeing with Coral Springs' claim of a vested right, relied on our unpublished opinion in National Advertising Company v. City of Ft. Lauderdale, 8 F.3d 36 (11th Cir. Oct. 26, 1993) (per curiam) (table) [hereinafter "National II"], a later appeal of the case at issue in National I. In that case, a sign company had filed suit arguing that Fort Lauderdale's sign code contained unconstitutional provisions, that those provisions were not severable from the constitutional provisions, and therefore that the code was unconstitutional as a whole. Six weeks after the complaint was filed in federal district court, the City amended its code and eliminated the allegedly unconstitutional provisions in an effort designed to moot the lawsuit.

We ruled the suit was not moot in light of the voluntary cessation doctrine. See National I. After returning to district court, the sign company won on the merits of the case, demonstrating that the old sign code was unconstitutional as a whole. Nevertheless, the district court ruled that the company had no vested right to its original permit. On appeal, a panel of this Court reversed, holding that

39

"[w]hen an application for a permit satisfies all existing and pending laws, the permit must then issue: a new law passed after the application was filed has no effect on the matter of issuance." Slip op. at 6. We added that [t]he rule is the same when the existing law purportedly prohibits the desired use, but the existing law is later declared unconstitutional. Id. (citing Harris, 31 So. 2d at 266; Margate, 546 So. 2d at 1094). The Court distinguished between two situations, one where reliance is required to create a right, and one where it is not required. "Absent reliance, a landowner generally has no right to existing zoning; the municipality can apply a new law to deny a use that was legal under an old law, unless the owner has relied (usually by spending money) on the old law." Id. at 7 (citing Cone, 365 So. 2d at 739). "But when a municipality denies an application for a building permit, the applicant is deprived of a fair chance to rely on existing law. Where the municipality has wrongfully denied an application -- thus wrongfully denying the applicant the right to rely on the law then existing -- requiring a showing of reliance would allow the municipality to gain an advantage from its own wrongful act." Id. at 7-8 (citing Smith, 383 So. 2d at 688). We therefore granted the sign company a permit.

National II, however, involved a very different set of circumstances. As we have noted, the City of Fort Lauderdale did not amend its sign ordinance until six

40

weeks after it had been sued. The next day, it moved for dismissal, making plain its reason for the belated change in the challenged ordinance. This sequence of actions indicated a lack of good faith, and it thus came as no surprise that we held the plaintiff possessed a vested right in the sign permit. National II thus fit into the pattern of state cases such as Harris, where the municipality hastily changed the law at the last minute to defend itself, well after a legal challenge had been brought.

Again, by contrast, in this case, the City promptly changed the Sign Code after receiving a single letter from plaintiff's counsel, before it had been sued by Coral Springs or, for that matter, by anyone else. And as we have noted, there is absolutely no reason to believe that the City has any intention of resurrecting the old Sign Code. Nor is there any hint that the amendments to the Sign Code were prompted by a desire to single out Coral Springs unfairly, inasmuch as the sign it wanted to put up was undoubtedly impermissible under both the old and the Amended Sign Code, and the reasons the old Sign Code may have been unconstitutional were wholly unrelated to the reasons the permit application was

rejected. In short, unlike in <u>National II</u>, we can discern no bad faith or arbitrary behavior on the part of the City.[13]

Our holding is also compelled because we are sitting as a court of equity. It is a bedrock principle of courts of equity that they may impose the substantive remedy of injunctive relief <u>only</u> when fundamental fairness and justice demand it. <u>See</u> 27A Am. Jur. 2d <u>Equity</u> § 110 (2003) ("The court [of equity] will grant relief only when fairness and good conscience demand it."). Indeed, courts of equity are loath to allow loopholes, technicalities, or game-playing to dictate results when those results would violate basic notions of equity and fair play. "While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position

_____

[13] In our unpublished <u>National II</u> opinion, we cited the District Court of Appeal's decision in <u>Smith v. City of Clearwater</u> for the proposition that reliance was not required for a court to find that an applicant has a right to a permit notwithstanding subsequent changes in the law. As we read it, however, the <u>Smith</u> court did not say that vested rights are <u>always</u> created in applications for permits. Rather, <u>Smith</u> said that vested rights may be created in the absence of reliance only under very specific circumstances. 383 So. 2d at 688. And in fact, the <u>Smith</u> court's attempt to delineate the circumstances in which injunctive relief should be granted itself fell short of fully explicating the state of Florida law, because it did not consider the clear and extensive pattern of Florida cases that have found vested rights or their equivalent in non-reliance cases only when there was evidence of bad faith by the municipality, and an arbitrary attempt to single out the applicant. We therefore reject the suggestion that vested rights may be created under Florida law in the absence of equitable estoppel, detrimental reliance, or bad faith. To the extent some district court opinions have found otherwise, <u>see</u> <u>Fla. Outdoor Adver., LLC v. City of Boynton Beach</u>, 182 F. Supp. 2d 1201, 1209 (S.D. Fla. 2001); <u>Wilton Manors St. Sys. v. City of Wilton Manors</u>, 2000 WL 33912332, at *5 (S.D. Fla. 2000), we conclude that they have misapprehended Florida law on this subject.

42

in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies." 2 Pomeroy, Equity Jurisprudence § 398, at 93 (5th ed.).

As the United States Supreme Court explained long ago: "It is a principle in chancery, that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity." Bein v. Heath, 47 U.S. 228, 247, 6 How. 228, 247, 12 L. Ed. 416 (1848). Or as the Supreme Court later framed the idea, "[c]ourts of equity frequently decline to interfere on behalf of a complainant whose attitude is unconscientious in respect of the matter concerning which it seeks relief." Nat'l Fire Ins. Co. of Hartford v. Thompson, 281 U.S. 331, 338, 50 S. Ct. 288, 291 (Mem.), 74 L. Ed. 881 (1930) (citing Deweese v. Reinhard, 165 U. S. 386, 390, 17 S. Ct. 340, 41 L. Ed. 757 (1897). As one Florida Supreme Court justice put it, "[o]ne of the most elementary and fundamental concepts of equity jurisprudence and a universal rule which affects the entire system of equity jurisprudence is the maxim that 'He who comes into equity must come with clean hands.' This principle is founded upon

conscience and good faith." Ryan v. Ryan, 277 So. 2d 266, 276 (Fla. 1973)

(Roberts, J., dissenting).

In this case, we have found that the defendant City proceeded in good faith, promptly addressing and repealing the offending statute -- before any suit had been filed, and without having singled out any plaintiff for special treatment. And the plaintiff Coral Springs never applied for a permit against the backdrop of a new Sign Code which had essentially eliminated the unconstitutional provisions. Instead, it apparently saw an opportunity to take advantage of a retroactive application of the law to secure a right to build a sign that plainly violated the new ordinance in the same way it did the old one. If fundamental notions of equity require us to order the City to grant Coral Springs the sign permit it seeks, those reasons escape us -- and we can divine no sign that the Florida courts would hold otherwise. Indeed, even the district court, which ruled in favor of Coral Springs, noted that "other courts have expressed concerns about such lawsuits as this one in which a plaintiff submits an application for a permit to build a billboard that will assuredly be denied because it does not comply with the ordinance at issue, only to challenge the constitutionality of the ordinance as a whole." Coral Springs, 287 F. Supp. 2d at 1319; see also Fla. Outdoor Adver. v. City of Boynton Beach, 182 F. Supp. 2d at 1206 (calling "unsettling" the "strategic" use of the Supreme Court's

44

commercial speech doctrine in this manner); <u>Granite State Outdoor Adver., Inc. v.</u>
<u>City of Clearwater, Fla.</u>, 213 F. Supp. 2d 1312, 1333 (M.D. Fla. 2002), <u>aff'd in</u>
<u>part & rev'd in part on other grounds</u>, 351 F.3d 1112 (11th Cir. 2003) (noting that
"[m]any courts, like this one, and many commentators, are concerned that local
governments have been placed in a tenuous and near impossible position in
drafting a constitutional or content-neutral sign ordinance"); <u>Fla. Outdoor Adver.,</u>
<u>LLC. v. City of Boca Raton, Florida</u>, 266 F. Supp. 2d 1376 (S.D. Fla. 2003).

The argument that a sign company somehow possesses an irrevocable
vested right in a sign permit whenever it applies for one under an illegal
ordinance, even if the law is fixed immediately thereafter, may lead to an
anomalous result if taken to its logical conclusion. Thus, according to this
reasoning, because the original Sign Code was unconstitutional, virtually any
application to build a sign before the passage of the Amended Sign Code would
have created a vested right. This would mean that if the petitioner had applied for
a permit to build a sign that was not just 672 square feet (itself almost <u>eight</u>
<u>times</u> larger than the permitted size of any sign under either the old or the
Amended Sign Codes), but even one that was a thousand or five thousand or ten
thousand square feet, it would be entitled to a permit long after a constitutional
ordinance prohibiting such signs had been duly enacted. An application for

45

literally <u>any</u> sign of any size, shape, or height would have created a vested right in a permit, and nothing that City did after the application was submitted could have taken it away. Absolutely nothing in Florida in the case law gives any hint that vested rights can be created so easily.[14]

## C. Conclusion on Mootness

We see no reasonable possibility that the City will reenact the old Sign Code. Furthermore, Coral Springs has incurred precious little expense in detrimental reliance on the City's Sign Code, and the City has exhibited none of

---

[14]In <u>Florida Outdoor Advertising, LLC. v. City of Boca Raton, Florida</u>, 266 F. Supp. 2d 1376 (S.D. Fla. 2003), the district court reached a similar result. The facts were similar to those before us: "[t]he now familiar strategy is to apply for a permit for erection of a billboard knowing full well that the permit will be denied under the city's existing sign ordinance but also aware that the ordinance is subject to legal attack." <u>Id.</u> at 1379. The court went on to explain that "the case is really about the use of the concept of vested rights to create a window of opportunity to build a large . . . and valuable billboard which would not be approved under the old <u>or</u> the new ordinance." <u>Id.</u> (emphasis added). Believing that the plaintiff was wrongly trying to take advantage of a technicality in the law, the City fought fire with fire and found a technicality of its own, pointing out that the plaintiff's application for a permit had not strictly complied with the old sign ordinance's notarizing requirements. <u>See id.</u> The court agreed and ruled in favor of the City, in large part because the equities of the case weighed strongly in favor of that result: "if equity is to be invoked, and the Eleventh Circuit's decision in [<u>National II</u>] is premised on notions of fairness and equity, these consideration [sic] cut against Florida Outdoor. Particularly where the city's denial of the permit was not based upon the deficiencies of the ordinance subject to challenge and where the anticipated denial was part of a strategy to construct a nonconforming sign, it does not seem unfair to expect Florida Outdoor to abide by other requirements of law." <u>Id.</u> at 1381 (citation omitted).

the bad faith or arbitrary behavior present in every Florida case where its courts have found a vested right in the absence of detrimental reliance. Given their past rulings -- and the obvious implications of a contrary result -- it seems highly unlikely that Florida's courts would find that Coral Springs acquired a vested right under the circumstances of this case, and we can see no reason to do so. Accordingly, we do not see how the plaintiff may rely on either the doctrine of voluntary cessation or the acquisition of a vested right to convert a moot case into a justiciable one.

### III

Having found that the City has no intention of reenacting the Sign Code and that Coral Springs possesses no vested right in a sign permit, the case still may not be moot if the Amended Sign Code contains the same constitutional defects as its predecessor. "[A] superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot." Naturist Soc'y, Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th

47

Cir. 1992).  Thus, if the Amended Sign Code contains the same unconstitutional provisions as its predecessor, this case may not be moot.

The Amended Sign Code contains some of the same provisions as the old Sign Code that Coral Springs has alleged violate the First Amendment by: (1) favoring commercial speech over noncommercial speech;[15] and (2) favoring certain types of noncommercial speech over other kinds of noncommercial speech.[16]  However, after careful review of the Amended Sign Code and the relevant law, we find that the Code does not, in fact, favor commercial speech over noncommercial speech.  Moreover, some of the provisions that allegedly favor certain kinds of noncommercial speech over others are not in the Amended Sign Code and therefore the challenge to them is moot.  Other challenged provisions are in the Amended Sign Code; however, we are satisfied that they are not related to, and are fully severable from, the provisions of the Code that are actually responsible for the denial of Coral Springs' application for a sign permit, and

---

[15]See Amended Sign Code § 16-248 ("The following signs are prohibited anywhere in the city: . . . . (5) Off-premises signs . . . .").

[16]See Amended Sign Code § 16-248(2)-(5) (exempting time-and-temperature signs, temporary grand opening signs, special event signs, and temporary project signs from general prohibitions on signs); Id. § 16-253 (saying that "[o]nly the following temporary signs are permitted": grand opening banner signs, model signs, political signs, real estate signs, contractor signs, garage sale signs, project signs, and roadside memorial signs); Id. § 16-261 (saying that "[a] permit shall not be required for" certain kinds of signs, including, among others, "real estate signs," "warning or notice-type signs," and "political signs").

therefore need not be reviewed because doing so would have utterly no impact on the outcome of this case.

## A. Favoring Commercial Over Noncommercial Speech

First, Coral Springs argues that the Sign Code unconstitutionally favored commercial speech over noncommercial speech by prohibiting off-site commercial signs. Specifically, the old Sign Code prohibited "[o]ff-premises commercial signs or billboards." § 16-248(a)(6) (emphasis added). Section 16-248(5) of the Amended Sign Code likewise prohibits "[o]ff-premises signs," which are specifically defined as being "[a]ny sign advertising a commercial establishment, activity, product, service or entertainment, which is sold, produced, manufactured, available or furnished at a place other than on the property on which the sign is located," § 16-247(b)(26) (emphasis added). Coral Springs suggests that these provisions somehow discriminate against non-commercial speech, even though the restrictions apply only to commercial speech. This claim is based on a mischaracterization of the off-site ban as applying to noncommercial speech, when it plainly does not.

In Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981), the Supreme Court struck down certain aspects of a city's billboard ordinance favoring commercial over noncommercial speech and certain kinds of noncommercial speech over others, but also permitted cities to distinguish reasonably between onsite and offsite commercial advertising:

> [W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising. Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising. Third, San Diego has obviously chosen to value one kind of commercial speech -- onsite advertising -- more than another kind of commercial speech -- offsite advertising.

Id. at 511-12, 101 S. Ct. at 2894-95 (citation omitted). These words are exactly on point in this case, where the City's suspect provision distinguishes between on-site commercial and off-site commercial advertising, but makes no reference to noncommercial speech. Moreover, the Amended Sign Code expressly allows noncommercial messages at least as much leeway as commercial ones: "Notwithstanding any provisions of this article to the contrary, to the extent that this article permits a sign containing commercial copy, it shall permit a non-commercial sign to the same extent." Amended Sign Code § 16-247(a).

50

If the explicit wording of this ordinance were not enough to make clear that the City's bans on offsite signs do not cover noncommercial speech, this Circuit has held that noncommercial messages are inherently onsite. Our decision in Southlake Property Associates, Ltd. v. City of Morrow, Georgia, 112 F.3d 1114 (11th Cir. 1997), is on point. In that case, we evaluated a challenge to a sign ordinance that prohibited billboards, which it defined as any "sign which advertises a commodity, product, service, activity or any other person, place, or thing, which is not located, found or sold on the premises upon which such sign is located." Id. at 1117. In determining the extent to which this regulation prohibited noncommercial messages, it became necessary to know the actual "site" of noncommercial speech:

> The ordinance prohibits signs which seek to attract attention to any person, place, subject, or thing not located on the premises where the person, place, subject, or thing is found. Noncommercial speech usually expresses an idea, an aim, an aspiration, a purpose, or a viewpoint. Where is such an idea located? What is the site upon which the aspiration is found?

Id. at 1118. We concluded that a noncommercial message is inherently onsite, whatever its location. "An idea, unlike a product, may be viewed as located wherever the idea is expressed, i.e., wherever the speaker is located. Under this alternative view, all noncommercial speech is onsite. A sign bearing a

51

noncommercial message is onsite wherever the speaker places it." Id. (footnote omitted). We thus agreed with the City of Morrow's own interpretation of its ordinance and concluded that "[t]he definition of billboard as an offsite advertising sign does not include noncommercial speech as such speech is always onsite." Id. at 1119.

Coral Springs nevertheless insists that the Sign Code treated onsite signs more favorably than offsite signs, eliding the fact that, according to the law of this Circuit, noncommercial messages are by definition onsite signs and therefore certainly not treated unfavorably compared with commercial signs. We thus are unpersuaded by Coral Springs' argument that the Sign Code -- in either its original or Amended form -- impermissibly favors commercial over noncommercial speech.[17]

## B.  Content Discrimination Among Types of Noncommercial Speech

---

[17]Contrary to the Coral Springs' claims, our recent decision in Café Erotica of Florida, Inc. v. St. Johns County, 360 F.3d 1274 (11th Cir. 2004), is consistent with this analysis. In that case, we struck down the St. Johns County sign ordinance that we interpreted as effectively limiting the maximum size of political messages to roughly one-seventeenth that of commercial ones. See id. at 1280-81, 1291-92. By contrast, the Amended Sign Code in the City of Sunrise explicitly allows the same expressive rights for noncommercial signs, including political signs, as it does for commercial signs. Amended Sign Code § 16-247(a).

Coral Springs' second pertinent argument is that the Sign Code impermissibly favors some forms of noncommercial speech over others.[18] Again, we are unpersuaded. In Metromedia, the Supreme Court ruled that cities are limited in their authority to distinguish among various types of noncommercial speech. 453 U.S. at 515, 101 S. Ct. at 2896 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: 'To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.'" (quoting Consol. Edison Co. v. Pub. Serv. Comm'n, 447 U.S. 530, 538, 100 S. Ct. 2326, 2333, 65 L. Ed. 2d 319 (1980))).

Coral Springs argues that the Sign Code violated this prohibition in a number of ways, including: (1) permitting public interest signs but not other noncommercial signs on public property; (2) permitting temporary political and roadside memorial signs but not other temporary noncommercial signs; (3) permitting temporary "special event" signs but not temporary signs for other

_____

[18]See, e.g., Amended Sign Code § 16-248(2)-(5) (exempting time-and-temperature signs, temporary grand opening signs, special event signs, and temporary project signs from general prohibitions on signs); Id. § 16-253 (saying that "[o]nly the following temporary signs are permitted": grand opening banner signs, model signs, political signs, real estate signs, contractor signs, garage sale signs, project signs, and roadside memorial signs); Id. § 16-261 (saying that "[a] permit shall not be required for" certain kinds of signs, including, among others, "real estate signs," "warning or notice-type signs," and "political signs").

53

noncommercial events; (4) prohibiting animated signs, except for those displaying the time or temperature; (5) permitting political campaign signs connected to elections but prohibiting political signs unrelated to elections; and (6) exempting certain noncommercial signs such as election signs from the permitting process required of other noncommercial signs.

In addition, Coral Springs says that the old Sign Code violated the First Amendment by lacking procedural safeguards necessary for a speech licensing plan. It allegedly did so in two ways. First, Coral Springs claims, the Sign Code gave "unbridled discretion" to government officials considering permit applications, by failing to name specific criteria for approving or denying applications, and by failing to include any mechanism for prompt judicial review of application denials. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-26, 110 S. Ct. 596, 605, 107 L. Ed. 2d 603 (1990); Freedman v. Maryland, 380 U.S. 51, 85 S. Ct. 734, 13 L. Ed. 2d 649 (1965). Second, the Sign Code imposed no specific time period by which the decision maker must approve or deny applications.

Even if any of these aspects of the old Sign Code were unconstitutional, the challenge is moot if they were not retained in the Amended Sign Code. Several of these challenges are, in fact, moot because the Amended Sign Code remedied the

alleged defects.  First, the parts of the old Sign Code that permitted public interest signs but no other noncommercial signs have been amended.  The relevant provisions of the old Sign Code were embodied in § 16-248(a)(12), which prohibited "[t]emporary and permanent signs, other than public interest signs, places [sic] on public property"; and § 16-250, which defined and delineated the proper uses of "Public interest signs."  Notably, however, the Amended Sign Code eliminated the exemption for public interest signs.  The provision now simply prohibits "[t]emporary and permanent signs, placed on any public property." Amended Sign Code § 16-248(11).  Moreover, § 16-250 of the Sign Code was repealed in its entirety.  Plainly, then, the challenge to these provisions has been rendered moot by the change in the law.

We add that plaintiff's claim that election-based political signs are favored over other political signs is also moot.  The old Sign Code said that "Political Signs" could be displayed "60 days prior to election; up to 14 days after the election," and was silent on political signs not connected with an election.  Sign Code § 16-253.  But the Amended Sign Code changed the rule, imposing the aforementioned time limits only "[i]f the copy is related to an election."  Amended Sign Code § 16-253.

Also now moot is the view that the old Sign Code lacked procedural

safeguards.  The Amended Sign Code does not grant unbridled discretion to

officials reviewing applications for sign permits.   The Amended Code specifically

provides that "[t]he department shall approve or deny the sign permit based on

whether it complies with the requirements of this article."  § 16-261.  The decision

makers are thus bound by the specific provisions of the statute's regulations in

rendering their decisions.  In addition, the Amended Sign Code provides for timely

judicial review of denials of permits,[19] and it imposes a specific time limit by

which permit applications must be approved or denied.[20]

Coral Springs' claim that the City's sign ordinance still impermissibly

discriminates among certain types of speech by exempting some kinds of

noncommercial signs -- such as political signs -- from the permitting requirements

imposed on most signs, is not moot, because this exemption was retained in the

---

[19]The Amended Sign Code says:

> The applicant may file a written notice of appeal to the city commission
> within fifteen (15) days after the receipt of the department's written notice.
> The city commission shall hear the appeal and render a decision within
> thirty (30) days after the date of receiving the written notice of appeal.  If
> the city commission does not grant the appeal, then the applicant may seek
> relief in the Circuit Court for Broward County, as provided by law.

Amended Sign Code § 16-261.

[20]"The department shall approve or deny the sign permit within thirty (30) days after
receipt of the application."  Id.

56

Amended Sign Code. See Amended Sign Code § 16-261. This challenge, however, fails on the merits. A panel of this Court explicitly rejected a nearly identical challenge in Messer v. City of Douglasville, Georgia, 975 F.2d 1505 (11th Cir. 1992). Messer attacked a sign ordinance exempting five kinds of signs from permitting requirements.[21] We explicitly distinguished between exemptions from permitting requirements and exemptions from outright prohibitions such as those in Metromedia: "[T]he Douglasville exemptions are not exemptions from a general ban of all off-premise billboards, but from permitting requirements and permits fees. Messer has not challenged the permit process as an unconstitutional restriction on speech. Thus, the Douglasville sign ordinance stands on a different footing from the complete bans on speech in [Metromedia and National Advertising Co. v. Orange, 861 F.2d 246 (9th Cir. 1988)]." Id. at 1513. The same distinction applies to the permitting exemptions in the old Sign Code and the Amended Sign Code. Simply put, a permit requirement is wholly different from a

---

[21]"Section 26-17 of the Douglasville sign code exempts five types of signs from permitting requirements and/or permit fees: 1) one wall sign per building side announcing the business and attached to the side of the building, 2) one real estate 'for sale' sign per property frontage, 3) one bulletin board located on religious, public, charitable or educational premises, 4) one construction identification sign, and 5) directional traffic signs containing no advertisements." Id. at 1511.

ban, and exemptions from the former are correspondingly different from -- and far

less suspect than -- exemptions from the latter.[22]


## C. Severability


Even though still other parts of the Amended Sign Code may be

unconstitutional,[23] we need not -- and do not -- consider the merits of the challenge

to their validity since any decision on the merits can have no bearing on the case

before us.  It is by now clear that if challenged parts of the Amended Sign Code

were severable from the parts of the Code that actually caused the denial of the

permit application, there would be no point in evaluating the plaintiff's arguments

as to those provisions.  Indeed, if we were to evaluate the validity of certain

---

[22]The permitting exemption for political signs is particularly important for the protection of political speech, which enjoys the highest level of First Amendment protection.  See, e.g., McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346-47, 115 S. Ct. 1511, 1518-19, 131 L. Ed. 2d 426 (1995); Buckley v. Valeo, 424 U.S. 1, 14, 96 S. Ct. 612, 632, 46 L. Ed. 2d 659 (1976); Roth v. United States, 354 U.S. 476, 484, 77 S. Ct. 1304, 1308, 1 L. Ed. 2d 1498 (1957). Exempting political signs, particularly those whose relevance is subject to the time pressures of impending election, from permitting requirements is not only constitutionally permissible, but may well be constitutionally required.  See Nat'l Adver. Co. v. City of Miami, 287 F. Supp. 2d 1349, 1375-76 (S.D. Fla. 2003).

[23]See, e.g., Amended Sign Code § 16-248(2)-(5) (exempting time-and-temperature signs, temporary grand opening signs, special event signs, and temporary project signs from general prohibitions on signs); Id. § 16-253 (saying that "[o]nly the following temporary signs are permitted": grand opening banner signs, model signs, political signs, real estate signs, contractor signs, garage sale signs, project signs, and roadside memorial signs).

provisions of the Amended Sign Code, knowing that the result of this inquiry could have no effect on the result in this case, our pronouncements would be essentially advisory in nature.

Severability of a local ordinance is a question of state law. City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 772, 108 S. Ct. 2138, 2152, 100 L. Ed. 2d 771 (1988). And Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones. According to the Florida Supreme Court, "[s]everability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." Ray v. Mortham, 742 So. 2d 1276, 1280 (Fla. 1999) (citing State v. Calhoun County, 126 Fla. 376, 383 (1936)). The doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is 'designed to show great deference to the legislative prerogative to enact laws.'" Id. (quoting Schmitt v. State, 590 So. 2d 404, 415 (Fla. 1991)).

Severability is not possible, however, when "the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail." Schmitt, 590 So. 2d at 414. Whether a statute is severable is determined by "its relation to the overall legislative intent of the statute of which it is a part, and whether the statute,

59

less the invalid provisions, can still accomplish this intent." Martinez v. Scanlan, 582 So. 2d 1167, 1173 (Fla. 1991) (quoting E. Air Lines, Inc. v. Dep't of Revenue, 455 So. 2d 311, 317 (Fla. 1984)). The doctrine of severability, thus, "recognizes that federal courts have an affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so." Fla. Outdoor Adver., 182 F. Supp. 2d at 1209 (citing Ray, 742 So. 2d at 1280).

The Florida Supreme Court has suggested this test for discerning severability in Smith v. Department of Insurance:

> When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

507 So. 2d 1080, 1089 (quoting Cramp v. Bd. of Pub. Instruction, 137 So. 2d 828, 830 (Fla. 1962)). According to Florida law, then, the unconstitutional part of a challenged statute should be excised, leaving the rest intact and in force, when doing so does not defeat the purpose of the statute and leaves in place a law that is complete.

We are fully satisfied that the purpose of the Amended Sign Code is not defeated by the removal of the purportedly unconstitutional provisions (such as the exemptions in § 16-248(2)-(5) and § 16-253), which make up but a small part of the whole. The Amended Sign Code still makes perfect sense when stripped of its suspect provisions -- the argument that the grammar of some of the provisions of the sign Code became nonsensical when stripped of their offensive aspects is simply incorrect. The allegedly problematic aspects of the Amended Sign Code can be easily excised without sacrificing either the grammar or structure of the ordinance, or its overall stated purpose, which is to "create a comprehensive system of street graphic controls, thereby facilitating clear communication, reduced traffic or structural hazards, and an enhanced aesthetic appearance of the city." § 16-247(a).

The regulatory purpose of the undisputed sections of the Sign Code -- avoiding public eyesores and traffic disruption -- would not be destroyed by the elimination of the suspect content regulations. Cutting out the problematic parts of § 16-248 (which exempted certain types of signs from general prohibitions) and § 16-253 (which allowed certain types of temporary signs and banned all others) still leaves in place a comprehensive and coherent system of sign regulation. Eliminating them does not defeat the ordinance's purpose, nor does it render the

61

Amended Sign Code as a whole logically or grammatically nonsensical. Nor does their elimination affect the portions of the Amended Sign Code that are actually germane and relevant to the City's rejection of Coral Springs' application: the prohibition of permanent off-premises signs, § 16-248(5); the prohibition of pole signs, § 16-248(6); the regulations on the size, height, and number of nonresident district permanent signs, § 16-252; the landscaping requirements for signs, § 16-255; and the approval process for sign permits, § 16-261.

We find it wholly implausible that the City would have preferred no sign ordinance at all to one that contains all the current parts of the Amended Sign Code other than the suspect content regulations. And eliminating those portions does not in any way affect the other parts, which are indisputably designed to facilitate clear communication, reduce traffic and structural hazards, and enhance the City's aesthetic appearance.

The plaintiff has expressed alarm that questionable provisions were "scattered throughout the Sign Code." Coral Springs, 287 F. Supp. 2d at 1320. But in fact, the Florida Supreme Court has expressly allowed for severance of individual sentences or even phrases when it was possible to do so without defeating the purpose of the statute as a whole. See, e.g., State v. Williams, 343

So. 2d 35, 38 (Fla. 1977); <u>Cramp</u>, 137 So. 2d at 830-31; <u>see also</u> <u>Jones v. Smith</u>, 474 F. Supp. 1160, 1169 (S.D. Fla. 1979) (noting that "[t]he Florida Supreme Court has stricken a sentence, and even a single phrase, while preserving the remainder of the statute" (citations omitted)); <u>Granite State Outdoor Adver., Inc. v. City of Clearwater</u>, 213 F. Supp. 2d 1312, 1326-27 (M.D. Fla. 2002) (striking down a number of content-based provisions in a city's sign ordinance but leaving in place numerous valid provisions of the law); <u>G.K. Ltd. Travel v. City of Lake Oswego</u>, 2004 WL 817142, at *9 (D. Or., Mar. 29, 2004) ("The stricken portions of the Sign Code are minor exemptions or exceptions to major portions of the Sign Code (e.g., regulations governing temporary signs) [and the] remaining parts of the Sign Code are not dependent on the stricken portions and can be executed effectively without them."). We would have no problem doing the same with the Amended Sign Code.

If these reasons were not sufficient to make clear that parts of the Amended Sign Code are readily severable, the City's Land Development Code expressly provides for the possibility that parts of it might not pass constitutional muster:

> Should any provision of this ordinance be declared by a court of competent jurisdiction to be invalid, the same shall not affect the validity of the ordinance as a whole, or any part thereof, other than the part declared to be invalid.

63

Land Dev. Code Art. XVIII, § 16-291. Clearly, then, the City's expressed legislative desire is to keep as much of its ordinances as it can. Moreover, Florida law says that, "[a]lbeit not binding, a legislatively expressed preference for the severability of voided provisions is persuasive." Moreau v. Lewis, 648 So. 2d 124, 127 (Fla. 1995) (citing State v. Champe, 373 So. 2d 874, 880 (Fla. 1978)). This holding, and more broadly the doctrine of severability, weighs against the district court's finding that the challenged provisions were not severable from the rest of the Sign Code. To rule otherwise would seriously infringe on the notion of legislative autonomy and ignore Florida's doctrine of severability.

Finally, even if we were to rule the remaining challenged portions to be unconstitutional, it would not make a whit of difference to Coral Springs; it would not have a right to a sign permit whether these provisions of the Amended Sign Code are valid or not. We thus have no reason to decide on their constitutionality because doing so would have no impact on the plaintiff's interests. Cf. Crowell v. Benson, 285 U.S. 22, 62, 52 S. Ct. 285, 296-97, 76 L. Ed. 598 (1932).

We confronted a similar situation in Hershey v. City of Clearwater, 834 F.2d 937 (11th Cir. 1987), a civil rights action in Florida where the plaintiff challenged a city's criminal ordinance that made it illegal "to lodge or sleep in" a

motor vehicle parked on the street.  Id. at 939.  Hershey said that the prohibition

on sleeping was unconstitutionally overbroad.  But we decided that because (1) the

"or sleep" provision of the law was severable from the rest of it; and (2) there was

still probable cause to arrest Hershey for "lodg[ing]" in his car, we need not and

did not pass on the constitutionality of the "or sleep" clause.  Id. at 939-40 & n.5

("[W]e do not reach the question of whether the ordinance as written -- that is,

including the prohibition against sleeping -- is unconstitutional . . . .").  In this

signage case, there is even less reason to decide on the constitutionality of the

challenged provisions.  In Hershey, at least, the challenged part of the law was

among the reasons for the plaintiff's arrest.  Here, by contrast, none of the content-

based provisions whose constitutionality Coral Springs challenged have anything

at all to do with the rejection of its permit application.  What we face today is a

statute from which the constitutionally sound wheat can readily be separated from

the constitutionally suspect chaff, and both state and local law express a clear

preference for doing just that.  The possibly unconstitutional provisions of the

Amended Sign Code have no bearing on the mootness of this suit, precisely

because they had nothing to do with the provisions of the law that caused the

rejection of the sign permit in the first place, and their removal would do nothing to affect the latter provisions.

Accordingly, we hold that the challenge to the Sign Code is moot, because the original Sign Code has been repealed, and there is no reasonable likelihood the City will reenact the old Sign Code. Moreover, as we read Florida law, Coral Springs holds no vested right in the sign permit. Finally, portions of the Amended Sign Code that arguably may be unconstitutional are fully severable from the rest of the law, including the provisions that led to the rejection of Coral Springs' application for a sign permit. The constitutionality of these provisions is therefore of no importance to the resolution of this matter, and accordingly we will not weigh in on this question today.

REVERSED and REMANDED, with instructions to DISMISS for lack of subject matter jurisdiction.